Filed 4/23/13

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE, | H037207 |
| Plaintiff and Respondent, | (Santa Clara County Super. Ct. No. BB304666) |
| v. | |
| BRUCE LEE BLACKBURN, | |
| Defendant and Appellant. | |

## I. INTRODUCTION

Under the Mentally Disordered Offender Act (the Act) (Pen. Code, § 2960 et seq.), the state can commit a mentally disordered offender (MDO) to a hospital for treatment for a specified period of time as a condition of parole, and it can extend the commitment if at the end of the period the MDO poses a danger to others due to his or her mental disorder. Under the Act, the MDO has the right to a jury trial. The Act requires that the court "advise the [MDO] . . . of the right to a jury trial" and conduct a jury trial "unless waived by the person and the district attorney." (Pen. Code, §§ 2966, subd. (b); 2972, subd. (a).)[1]

Defendant claims that an MDO has the right to decide whether to waive the right to a jury trial, and that the waiver provision requires a jury trial unless the MDO personally waives it. The Attorney General claims that counsel has exclusive control over whether to waive a jury trial and can do so even over the MDO's objection.

---

[1] All unspecified statutory references are to the Penal Code.

We hold that the waiver provision does not require a personal waiver or give counsel exclusive control. Rather, counsel may waive a jury at the MDO's direction or with the MDO's consent; and when there is cause to doubt the MDO's capacity to determine whether a bench or jury trial is in his or her best interests, counsel can make the decision even over the MDO's objection. Finally, to protect the right to a jury trial and ensure compliance with the statute, we further hold that when the court conducts a bench trial, the record must contain an express waiver and affirmatively establish the validity of that waiver.

## II. STATEMENT OF THE CASE

Defendant Bruce Lee Blackburn appeals from an order extending his commitment to Atascadero State Hospital (ASH) as an MDO. (§§ 2970, 2972.) He claims that the court erred in conducting a bench trial on the petition to extend his commitment and that the error violated his right to a jury trial.

We affirm the extension order.

## III. PROCEDURAL HISTORY

In 2004, defendant was convicted of first degree burglary and false imprisonment and sentenced to prison.[2] (§§ 459, 460, 236, 237.) In 2006, defendant was deemed an MDO and committed to ASH for treatment as a condition of parole. (§ 2962.) Thereafter, defendant's commitment was extended a number of times. (§§ 2962, 2970, 2972.) Before the last extension expired on October 19, 2011, the Santa Clara County District Attorney filed a petition to extend defendant's commitment once again. On July

---

[2] The record reveals that defendant entered the home of an 85-year-old woman at night. She awoke to find him naked and lying on top of her. He restrained her with his legs and kept her pinned down by pulling her hair. The woman managed to escape, and when police entered, they found defendant sitting naked on the toilet, eating pork chops and speaking incoherently.

19, 2011, after a bench trial, the court sustained the petition and extended defendant's commitment to October 19, 2012.

## IV. THE EXTENSION HEARING

At the extension trial, Kevin Perry, Ph.D., testified as an expert in the diagnosis and treatment of mental disorders and risk assessment. He was not a member of defendant's treatment team but met with defendant for a forensic evaluation and later drafted a report recommending an extension of his commitment. Dr. Perry testified that defendant suffers from "schizoaffective disorder, bipolar type," which defendant manifests by being paranoid that other patients are stealing from him and having grandiose delusions that he is the son of God and that he can communicate over long distances without any technology. Based on recent hospital progress reports and his own evaluation, Dr. Perry opined that defendant's disorder is not in remission. He noted that during the evaluation, defendant seemed to understand its purpose, but he exhibited "thought disorganization," in that his thinking was not logical or internally consistent, and he would jump from topic to topic. Defendant also expressed some persecutory delusional thoughts that hospital authorities were taking things from him.

Dr. Perry reported that defendant had been under an involuntary medication order at ASH, and even though that order had expired, defendant generally continued to take his medication. He was transferred to Coalinga State Hospital, and for a time, defendant's medication regimen was stopped because he developed some medical complications.

Dr. Perry reported that defendant realizes that it is good for him to attend hospital group therapy sessions, and he does so about 70 percent of the time. He further explained that before being considered for release, defendant would have to develop a wellness and recovery plan consisting of strategies to help him identify the things that trigger his symptoms and manage those symptoms and his behavior in the

3

community. Defendant had completed some work on a plan while at ASH, but as of the date of the hearing, he had not completed an "appropriate" and "viable" plan.

In sum, Dr. Perry opined that defendant posed a risk of harm to others due to his mental disorder and history of violent behavior. He noted that within the past few weeks, defendant had exhibited delusional and irrational thinking and impulsive and bizarre behavior similar to that which had accompanied his commitment offense. For this reason, Dr. Perry did not believe that defendant would do better in a less restrictive placement.

## V. CONTENTIONS

Defendant contends the court erred in failing to advise him of the right to a jury trial and conducting a bench trial. Initially, the record did not reflect a jury advisement or an express waiver. On our own motion, we directed the trial court to settle the record concerning whether there were any unreported, pretrial discussions about jury advisements and waivers. (See Cal. Rules of Ct., rules 8.155 & 8.137.)

In its settled statement, the court related that "[i]t was the custom and practice of [the Honorable Gilbert T. Brown] to call the mental health calendar each Friday on the record. Prior to calling the calendar, all cases set were discussed in chambers." Defendant's civil commitment was first called on April 6, 2011. At that time, counsel was appointed, and counsel waived defendant's presence because he was at Atascadero State Hospital. The case called again on April 29, 2011, then May 13, and then June 3. At each hearing, counsel waived defendant's presence. "On June 3, 2011, [defense counsel] stated in chambers that [defendant] was not willing to submit to an extension of his commitment to the Department of Mental Health and wanted a trial. He also stated that he, counsel, was requesting a court trial rather than a jury trial. The People were in agreement with having a court trial." Trial was set for July 19, 2011.

4

Given the settled statement, defendant contends that counsel's waiver was ineffective because section 2972 requires an MDO's personal waiver. Relying primarily on *People v. Otis* (1999) 70 Cal.App.4th 1174 (*Otis*) and *People v. Montoya* (2001) 86 Cal.App.4th 825, 829 (*Montoya*), the Attorney General argues that the statute does not require an MDO's personal waiver and instead gives counsel exclusive control over whether to have a bench or jury trial.

## VI.  MOOTNESS

The extension period of defendant's commitment has expired, and therefore the propriety of the court's order is now moot. Accordingly, it may not be necessary to address the parties' diametrically opposing legal claims concerning the validity of counsel's waiver and the bench trial. However, "we review the merits of appeals from timely filed petitions that are rendered technically moot during the pending of the appeal, . . . because the appellant is subject to recertification as an MDO, and the issues are otherwise likely to evade review due to the time constraints of MDO commitments. [Citations.]" (*People v. Merfield* (2007) 147 Cal.App.4th 1071, 1075, italics omitted.)

Moreover, we continually see appeals from commitment orders where, as here, the record does not reveal an advisement or an express waiver and where, as here, the defendant and the Attorney General assert the same competing claims. Moreover, in our view, the relevant published case law does not provide a clear, comprehensive, and definitive resolution of these claims. For these reasons, we exercise our discretion to address the parties' claims. (*In re Conservatorship of Person of John L.* (2010) 48 Cal.4th 131, 142, fn. 2 (*John L.*); e.g., *Conservatorship of Wendland* (2001) 26 Cal.4th 519, 524, fn. 1; *People v. Harris* (1993) 14 Cal.App.4th 984, 990; *Cramer v. Gillermina R.* (1981) 125 Cal.App.3d 380, 385.)

5

## VII. THE MDO COMMITMENT SCHEME AND EXTENSION PROCEDURE

When persons who have been convicted of a violent crime related to their mental disorders are eligible for release but currently pose a danger of harm to others, the Act permits their involuntary commitment to a state hospital for treatment until their disorders can be kept in remission. (*In re Qawi* (2004) 32 Cal.4th 1, 9 (*Qawi*); see *Lopez v. Superior Court* (2010) 50 Cal.4th 1055, 1061 (*Lopez*) [the MDO Act has the dual purpose of protecting the public while treating severely mentally ill offenders].)

The Act provides treatment at three stages of commitment: as a condition of parole, in conjunction with the extension of parole, and following release from parole. (*Lopez, supra*, 50 Cal.4th at p. 1061.) "Sections 2970 and 2972 govern the third and final commitment phase, once parole is terminated. If continued treatment is sought, the district attorney must file a petition in the superior court alleging that the individual suffers from a severe mental disorder that is not in remission, and that he or she poses a substantial risk of harm. (§ 2970.)" (*Lopez, supra*, 50 Cal.4th at p. 1063.)

As noted, section 2972, subdivision (a) provides, among other things, that when a petition is filed, the court "shall advise the person . . . of the right to a jury trial"; and "the trial shall be by jury unless waived by both the person and the district attorney."[3] To obtain an extension, the district attorney must prove, and the trier of fact must find beyond a reasonable doubt, that (1) the person continues to have a severe mental

_____

[3] Section 2972, subdivision (a) provides, "(a) The court shall conduct a hearing on the petition under Section 2970 for continued treatment. The court shall advise the person of his or her right to be represented by an attorney and of the right to a jury trial. The attorney for the person shall be given a copy of the petition, and any supporting documents. The hearing shall be a civil hearing, however, in order to reduce costs the rules of criminal discovery, as well as civil discovery, shall be applicable. [¶] The standard of proof under this section shall be proof beyond a reasonable doubt, and if the trial is by jury, the jury shall be unanimous in its verdict. The trial shall be by jury unless waived by both the person and the district attorney. The trial shall commence no later than 30 calendar days prior to the time the person would otherwise have been released, unless the time is waived by the person or unless good cause is shown."

disorder; (2) the person's mental disorder is not in remission or cannot be kept in remission without treatment; and (3) the person continues to represent a substantial danger of physical harm to others. (*Lopez, supra*, 50 Cal.4th at p. 1063; *People v. Beeson* (2002) 99 Cal.App.4th 1393, 1398-1399; § 2972, subds. (c), (e).)

## VIII. PERSONAL WAIVER VERSUS COUNSEL'S EXCLUSIVE CONTROL

As noted, defendant claims the Act requires an MDO's personal waiver, and the Attorney General claims that counsel has exclusive control over whether to have a bench or jury trial.

### A. Personal Waiver

In *Otis, supra,* 70 Cal.App.4th 1174 and *Montoya, supra,* 86 Cal.App.4th 825, the courts linked the issues raised by the two claims.[4] The courts concluded that an MDO's personal waiver is not required for two reasons: the statutory language does not expressly say so; and counsel must be able waive on behalf of an MDO who lacks the capacity to determine what is in his or her best interests. In both cases, the court upheld a waiver by counsel because the MDO lacked the capacity to make a reasoned decision.

In *Otis*, counsel waived a jury trial. The defendant objected and requested a jury trial, but at the time, he was delusional and said he was being sexually assaulted by invisible police. The court denied the request. On appeal the defendant claimed that the language requiring a jury trial "unless waived by both the person and the district attorney," meant that only *the person*—i.e., the MDO—could waive the jury trial. (*Otis, supra*, 70 Cal.App.4th at p. 1176.)

In a brief opinion, the court disagreed. It found "nothing in the requirement that the waiver must be by 'the person' precludes the person's attorney from acting on his

---

[4] *Otis* dealt with section 2966, subdivision (b) and *Montoya* dealt with section 2972, subdivision (a), but both sections require the court to advise the MDO of the right to a jury trial and conduct a jury trial "unless waived by the person and the district attorney."

behalf" and noted that "[t]he Legislature did not say the waiver had to be made 'personally.' " (*Otis*, *supra*, 70 Cal.App.4th at p. 1176.) The court opined that if the Legislature had intended to require a personal waiver, it would have made its intent clear and unambiguous. (*Ibid*.)

The court further explained that "[s]ection 2966 concerns persons who have been found by the Board of Prison Terms to be mentally disordered. The Legislature must have contemplated that many persons, *such as Otis*, might not be sufficiently competent to determine their own best interests. There is no reason to believe the Legislature intended to leave the decision on whether trial should be before the court or a jury in the hands of *such a person*." (*Otis, supra*, 70 Cal.App.4th at p. 1177, italics added; see *People v. Powell* (2004) 114 Cal.App.4th 1153, 1157-1159 (*Powell*) [relying on *Otis* to reject a claim that similar language in section 1026.5 required personal jury waiver].)

In *Montoya, supra,* 86 Cal.App.4th 825, counsel waived a jury. Although the defendant did not object, he claimed on appeal that his personal waiver was required. (*Id.* at pp. 828-829.) In concluding otherwise, the court followed *Otis*, agreeing that the statutory language did not expressly require a personal waiver or clearly preclude a waiver by counsel and that the Legislature could not have intended to require a personal waiver and thereby deny counsel the authority to act on behalf of an incompetent MDO. (*Montoya, supra*, 86 Cal.App.4th at pp. 830-831.)

The court acknowledged that a person could "be mentally disordered for some purposes and not for others." (*Montoya, supra*, 86 Cal.App.4th at p. 831.) However, it noted that the defendant's mind was not functioning normally, and he had repeatedly and recently demonstrated poor judgment and aberrant behavior. In upholding counsel's waiver, the court found "no reason to believe that defendant was capable of making a reasoned decision about the relative benefits of a civil jury trial compared to a civil bench trial." (*Ibid*.)

8

We agree with these courts' view of the statutory language.  When engaging in statutory construction, "[w]e begin with the statutory language because it is generally the most reliable indication of legislative intent.  [Citation.]  If the statutory language is unambiguous, we presume the Legislature meant what it said, and the plain meaning of the statute controls.  [Citation.]" (*Shirk v. Vista Unified School Dist.* (2007) 42 Cal.4th 201, 211.)  If the language is susceptible of multiple interpretations, we may look to a variety of extrinsic aids, including the ostensible objects to be achieved, the evils to be remedied, the legislative history, public policy, contemporaneous administrative construction, and the statutory scheme of which the statute is a part.  (*People v. Woodhead* (1987) 43 Cal.3d 1002, 1008.)

The waiver provision does not expressly require a "personal" waiver by the MDO.  And the term "the person" in the phrase "unless waived by both the person and the district attorney" (§§ 2966, subd. (b); 2972, subd. (a)) does not automatically or necessarily convey the notion that a waiver is effective only when "personally" made by the MDO.  Nor does the waiver provision clearly reflect a legislative intent to impose such a limitation or preclude a waiver by counsel on behalf of "the person."  We too observe that the Legislature knows how to require a personal waiver, and when it has intended to do so, it has used clear and unambiguous language.  (E.g., § 861, subd. (a)(1) [requiring personal waiver of statutory right to continuous preliminary examination]; § 977, subd. (b)(1) [same re waiver of presence at arraignment]; Welf. & Inst. Code, § 1801.5 [same re right to a jury in trial to extend juvenile detention].)

Furthermore, interpreting the language to exclude waivers by counsel results in consequences that, in our view, are illogical and anomalous and therefore, to be avoided.  (*People v. Martinez* (1995) 11 Cal.4th 434, 448.)

First, we note that for a variety of reasons, MDOs being treated in state hospitals often choose not to appear until the day of trial, courts do not automatically order them

9

transported to court for every pretrial hearing, and counsel routinely waive the defendant's presence at those hearings that often involve technical, procedural, and scheduling matters. Such was the case here. Given these practical and logistical issues, counsel must be able to act on the MDO's behalf in his or her absence. We cannot conceive of a logical reason to prohibit counsel from waiving a statutory right to a jury trial at the MDO's direction or with the MDO's express authorization but in his or her absence and instead compel the court to order the MDO's transportation and presence solely to secure his or her personal waiver. This is especially so because, as noted, counsel can waive a client's more fundamental state constitutional right to a jury in civil actions. (Cal. Const., art. I, § 16 [right to jury trial]; Code of Civ. Proc, § 631 [prescribing types of waiver]; *Zurich General Acc. & Liability Ins. Co. v. Kinsler* (1938) 12 Cal.2d 98, 105 (*Zurich*) [waiver by party or counsel], overruled on other grounds in *Fracasse v. Brent* (1972) 6 Cal.3d 784, 792; *Cadle Co. v. World Wide Hospitality Furniture, Inc.* (2006) 144 Cal.App.4th 504, 510; *Conservatorship of Maldonado* (1985) 173 Cal.App.3d 144, 148; see Code Civ. Proc., § 283, subd. (1) [counsel has authority to bind client in any of the steps of an action].)

We further note that competency to stand trial is not a prerequisite in a civil proceeding to commit a person who is dangerous due to mental illness. (E.g., *People v. Angeletakis* (1992) 5 Cal.App.4th 963, 967-968 (*Angeletakis*) [NGI commitment]; *People v. Moore* (2010) 50 Cal.4th 802 [SVP commitment].) However, a waiver "is the 'intentional relinquishment or abandonment of a known right.' [Citations.]" (*United States v. Olano* (1993) 507 U.S. 725, 733; *Reid v. Google, Inc.* (2010) 50 Cal.4th 512, 521.) To be valid, the waiver of a statutory right must be knowing, intelligent, and voluntary. (*In re Hannie* (1970) 3 Cal.3d 520, 526-527; *People v. Charles* (1985) 171 Cal.App.3d 552, 559.) As *Otis and Montoya* observe, some MDOs, like the defendants in those cases, may be so delusional or otherwise affected by their mental disorders that

10

they lack the capacity to know what is in their own best interests and make a rational decision. Under such circumstances, an MDO may not be able to knowingly and intelligently waive the right to a jury trial. If an MDO is incompetent, and in a particular case counsel believes that a jury waiver is in the MDO's best interests, requiring that MDO's personal waiver would undermine counsel's ability to protect the MDO's interests by preventing counsel from waiving a jury on his or her behalf and mechanically require the court to conduct a jury trial or give the incompetent defendant veto power over counsel's informed determination.

In our view, preventing counsel from waiving a jury at the NGI defendant's direction or with the MDO's consent and preventing counsel from doing so on behalf of an incompetent MDO are anomalous consequences that would flow from interpreting the waiver provision literally and restrictively to require a personal waiver. For that reason, we consider it unreasonable to infer such a restrictive and exclusive legislative intent from the statutory language. (Cf. *Conservatorship of Mary K.* (1991) 234 Cal.App.3d 265, 272 [rejecting claim that counsel's waiver at conservatee's direction was ineffective because personal waiver was required].)

In construing statutes, "[w]e may not under the guise of construction, rewrite the law or give the words an effect different from the plain and direct import of the terms used." (*California Fed. Savings & Loan Assn. v. City of Los Angeles* (1995) 11 Cal.4th 342, 349; accord *Estate of Griswold* (2001) 25 Cal.4th 904, 917.) Nor may we insert requirements or limitations that would cause the statute to conform to a presumed intent that is not otherwise manifest in the existing statutory language. (*Citizens to Save California v. California Fair Political Practices Com.* (2006) 145 Cal.App.4th 736, 747-748, *Tain v. State Bd. of Chiropractic Examiners* (2005) 130 Cal.App.4th 609, 617.)

Given our analysis of the statutory language, policy considerations, and potential consequences, we decline to insert a personal waiver requirement into the statute.

11

## B. Counsel's Exclusive Control

Although that provision does not invariably require an MDO's personal waiver and is broad enough to permit a waiver by counsel, it does not automatically follow, as the Attorney General claims, that counsel has exclusive control over the jury decision. To determine whether counsel does, we return to the waiver provision.[5]

The statutory language does not expressly confer such exclusive control; nor does it expressly or implicitly bar MDO's from controlling the decision. Moreover, the waiver provision must be read together with the advisement provision (see *Los Angeles County Metropolitan Transp. Authority v. Alameda Produce Market, LLC* (2011) 52 Cal.4th 1100, 1106-1107), and together, they do not reasonably suggest a legislative intent to confer exclusive control or bar MDOs from deciding whether to waive a jury trial. On the contrary, the two provisions contemplate that MDOs can make the decision and expressly provides for them to do so.

Section 2972, subdivision (a), provides that the court "shall advise the person . . . of the right to a jury trial." This language imposes a mandatory duty on the court.[6] (*Tarrant Bell Property, LLC v. Superior Court* (2011) 51 Cal.4th 538, 542 [" 'shall' " typically construed as mandatory; e.g., *People v. Tindall* (2000) 24 Cal.4th 767, 772.) It reflects a legislative intent to judicially ensure that "the person" knows that he or she has the right to a jury trial.

---

[5] We observe that the court's custom and practice of obtaining waivers from counsel in chambers off the record may well be based on the view that counsel has exclusive authority. If counsel does, then the court's practice represents practical, efficient, and convenient way to resolve the jury issue.

[6] We mean "mandatory" in its obligatory, rather than jurisdictional, sense as in a required, rather than discretionary, action. (See *Morris v. County of Marin* (1977) 18 Cal.3d 901, 908 [discussing distinction].)

We presume that the Legislature intended the advisement to perform a meaningful and useful function. (See *Clements v. T.R. Bechtel Co.* (1954) 43 Cal.2d 227, 233.) The purpose and function appear in the waiver provision, which requires jury trial unless waived by "the person." Although, as discussed above, the phrase "waived by the person" must be construed to permit a waiver by "the person's" attorney, the phrase unambiguously refers to a waiver by "the person"—i.e., the MDO. Thus, the purpose and function of this mandatory advisement are self-evident: to inform the MDO of the right to a jury trial so that he or she can decide whether to waive it. (See *People v. Barrett* (2012) 54 Cal.4th 1081, 1109 (*Barrett*) [a jury advisement enables person to comprehend and control decision to "request a jury trial"]; *People v. Koontz* (2002) 27 Cal.4th 1041, 1071 [purpose of standardized *Faretta* advisements is "to ensure a clear record of a knowing and voluntary waiver of counsel"]; § 1016.5, subd. (d) [required advisement of potential immigration consequences intended to inform decision of whether to waive rights and enter plea].)

We observe that if the Legislature had intended to give counsel exclusive control, it could have done so unambiguously by requiring a jury trial unless waived by "the person's *attorney*" just as it specified a waiver by the "district *attorney*." (Cf. § 2966, subd. (b) [requiring hearing within specified time unless waived by "petitioner or his or her counsel].) Conversely, we doubt the Legislature would have clouded that intent by requiring the court to advise "the person" and further requiring a jury trial unless waived by "the person." Moreover, if that had been the Legislature's intent, an advisement would serve no meaningful function, and there would have been no need to make the advisement mandatory. For this reason, it is not reasonable to infer exclusive control because it would effectively render the advisement provision meaningless, statutory surplusage. (See *McCarther v. Pacific Telesis Group* (2010) 48 Cal.4th 104, 110 [courts should avoid interpretation rendering part of the instrument surplusage].)

13

In short, just as we decline to limit the phrase "unless waived by the person" by inferring that only an MDO can waive a jury trial so too we decline to limit the phrase by inferring that counsel has exclusive control over the decision.

We acknowledge the nonstatutory, judicially recognized rule that "in both civil and criminal matters, a party's attorney has general authority to control the procedural aspects of the litigation and, indeed, to bind the client in these matters"; in other words, "counsel is captain of the ship." (*In re Horton* (1991) 54 Cal.3d 82, 94, 95; *Blanton v. Womancare, Inc.* (1985) 38 Cal.3d 396, 403-404.) We further note that in upholding counsel's waiver in *Otis,* the court cited *Zurich, supra,* 12 Cal.2d 98 for the general proposition that "in civil cases, an attorney has 'complete charge and supervision' to waive a jury." (*Otis*, *supra*, 70 Cal.App.4th at p. 1176.) However, we conclude that the "captain of the ship" rule in civil litigation does not govern whether counsel has exclusive authority to waive a jury in MDO proceedings.

In *Zurich, supra,* 12 Cal.2d 98, the court held that counsel's insistence on a jury trial did not constitute good cause for firing him and thus bar him from later seeking a share of her judgment. Citing the general rule, the court concluded that the attorney had the right and authority to insist on a jury trial. (*Id*. at pp. 105-106.)

Although *Zurich* did not involve a jury *waiver*, the court cited a number of cases and authorities, including *Shores Co. v. Iowa Chemical Co.* (1936) 222 Iowa 347 [268 N.W. 581] (*Iowa*). There, the defendant claimed that counsel lacked the authority to waive a jury by stipulation. However, the court explained that ordinarily counsel has implicit authority to enter binding stipulations on procedural matters. It then noted that the defendant was aware of counsel's waiver at the time, he had made no effort to set it aside, and he did not seek a jury trial until long after the stipulation had been entered. Given these circumstances, the court held that the defendant had failed to show that counsel lacked authority to waive a jury trial. (*Id*. at p. 583.)

14

Although *Zurich* and the *Iowa* case recognized counsel's authority to request or waive a jury in typical civil litigation, neither case involved a "special proceeding" in which the state seeks to involuntarily commit a person to a state hospital for treatment.[7] Neither case addressed whether counsel had such authority in a "special proceeding"; and neither case involved a statute that expressly required a jury advisement and jury trial unless waived by the person.

" 'It is axiomatic,' of course, 'that cases are not authority for propositions not considered.' (*People v. Jones* (1995) 11 Cal.4th 118, 123, fn. 2, quoting *People v. Gilbert* (1969) 1 Cal.3d 475, 482, fn. 7.) Thus, these cases do not support a conclusion that in MDO proceedings, the "captain of the ship" rule gives counsel exclusive control over whether to waive a jury trial. Insofar as *Otis* appears to imply as much, we disagree.

*Masterson, supra,* 8 Cal.4th 965 is a much more pertinent case on the issue because it involved a special proceeding to determine whether the defendant was competent to stand trial on criminal charges. (§§ 1368-1370.) There, counsel stipulated to an 11-person jury over the defendant's objection. In upholding counsel's authority to do so, the court more broadly concluded that in competency trials, counsel has exclusive control over the jury issue. The court noted the "captain of the ship" rule but did not base

---

[7] Civil commitment trials are initiated by a petition independently of a pending action and are "of a character unknown at common law." (*People v. Rowell* (2005) 133 Cal.App.4th 447, 451.) They are neither actions at law nor suits in equity and are instead considered a "special proceeding." (Code Civ. Proc., §§ 21-23; see *Tide Water Assoc. Oil Co. v. Superior Court* (1955) 43 Cal.2d 815, 822; *Le Louis v. Superior Court* (1989) 209 Cal.App.3d 669, 678; 3 Witkin, Cal. Procedure (5th ed. 2008) Actions, § 65, subd. 20, pp. 139-140; e.g., *People v. Yartz* (2005) 37 Cal.4th 529, 535 [SVP commitment trial under Welf. & Inst. Code, § 6603]; *People v. Masterson* (1994) 8 Cal.4th 965, 974 (*Masterson*) [competence trial under § 1369]; *In re Gary W.* (1971) 5 Cal.3d 296, 309 [trial extending juvenile commitment under Welf. & Inst. Code, § 1800]; *In re De La O* (1963) 59 Cal.2d 128, 150 [narcotics addict commitment trial under former § 6450]; *Bagration v. Superior Court* (2003) 110 Cal.App.4th 1677, 1685, fn. 7 [commitment of mentally retarded person under Welf. & Inst. Code, § 6500; *Montoya, supra,* 86 Cal.App.4th at p. 829 [MDO commitments under §§ 2966 & 2972].)

15

its conclusion on it. (*Masterson, supra,* 8 Cal.4th at pp. 969-970.) Rather, the court expressly based its conclusion on "an examination of the nature of competency proceedings as well as the jury trial right at issue." (*Id.* at p. 971.)

The court explained, "The sole purpose of a competency proceeding is to determine the defendant's present mental competence, i.e., whether the defendant is able to understand the nature of the criminal proceedings and to assist counsel in a rational manner. [Citations.] Because of this, the defendant necessarily plays a lesser personal role in the proceeding than in a trial of guilt. How can a person whose competence is in doubt make basic decisions regarding the conduct of a proceeding to determine that very question?" (*Masterson, supra*, 8 Cal.4th at p. 971.)

The court concluded that when doubt is raised about a defendant's competence, the defendant is assumed to be unable to act in his or her own best interests. For that reason, the defendant must act through counsel, and counsel has exclusive control over the conduct of the proceedings, including whether to request a jury trial. (*Masterson, supra*, 8 Cal.4th at pp. 971, 973; see *People v. Hill* (1967) 67 Cal.2d 105, 115, fn. 4 [no error in failing to advise defendant of right to jury in competence trial because counsel decides whether to have a jury trial].)

Under *Masterson*, therefore, if counsel has exclusive control, counsel derives it not so much from the "captain of the ship" rule but from the nature of MDO proceedings and the jury right at issue.

More recently, in *Barrett, supra,* 54 Cal.4th 1081, the Supreme Court provided further guidance when it decided whether counsel had exclusive control in a proceeding to commit a mentally retarded person who is dangerous. (Welf. & Inst. Code, § 6500.)[8]

---

[8] The *Barrett* court noted that at all pertinent times, the statutory scheme had used the terms "mentally retarded" and "mental retardation." The court acknowledged that subsequent "legislative enactments and proposed amendments replace references to 'mental retardation' under section 6500 et seq. with such terms as 'developmental

16

In *Barrett*, the court conducted a bench trial and committed the defendant. (*Barrett, supra,* 54 Cal.4th at pp. 1088-1092.) On appeal, she claimed that the federal Constitution provided the right to a jury trial and required a jury advisement and personal waiver. (*Id*. at p. 1093.) Although the statute did not provide the right to a jury trial, the Supreme Court agreed that constitutional considerations warranted recognizing an implied statutory right to a jury trial. (*Id*. at pp. 1097, 1100.) However, the court rejected advisement and waiver requirements because it found that counsel had exclusive control over whether to waive a jury trial. In reaching this conclusion, the court relied primarily on *Masterson.*

The court explained that mental retardation is a developmental disability that originates when an individual is a minor and continues, or can be expected to continue, indefinitely, and constitutes a " 'substantial disability for that individual.' " (*Barrett, supra*, 54 Cal.4th at p. 1103.) Moreover, for purposes of a commitment under section 6500, mental retardation involves " ' " '*significantly subaverage general intellectual functioning* existing concurrently with deficits in adaptive behavior,' and appearing in the 'developmental period.' " ' [Citations.]" (*Ibid*., italics in *Barrett*) The court opined that "the significant cognitive and intellectual deficits that the condition entails, which appear early in life and never recede, affect the ability to 'make basic decisions' regarding the conduct of the section 6500 proceeding. [Citation.] Such an individual thus plays a limited 'personal role' in the case, and must rely on counsel to decide all tactical and procedural matters, such as whether to exercise the jury trial right." (*Id*. at pp. 1103-1104.)

_____

disability' and 'intellectual disability.' [Citation.]" (*Barrett, supra*, 54 Cal.4th at p. 1088, fn. 2.) However, to avoid confusion, the court used the original terminology.

To avoid confusion when discussing *Barrett* and its application, we shall also use that outmoded terminology.

At our request, the parties briefed the impact of *Barrett*, if any, on the issues raised in this case.

The court rejected a claim that this approach "improperly 'presumes' that a person is mentally retarded before the fact finder has decided the issue." (*Barrett, supra*, 54 Cal.4th at p. 1104.) The court noted that a commitment petition is filed at the request of "a responsible and interested party (e.g., parent, conservator, correctional or probation official, or regional center director), who presents specific information (reasons) for supposing that the person is mentally retarded and dangerous, in need of treatment, and eligible for commitment. The significance of this request, and its role in providing a foundation for the petition and commitment process, is underscored by the verification requirement. (§ 6502.) . . . [¶] Second, where a section 6500 petition is filed, the trial court is entitled to a written report prepared by, or at the behest of, the director of the regional center, following an examination of the alleged mentally retarded person. (§ 6504.5.) Regional centers specialize in assessing and assisting mentally retarded and other developmentally disabled persons on an individual basis. [Citation.] Thus, the regional center report obviously serves as a professional pretrial evaluation of the person's history, condition, and behavior, and includes informed recommendations on treatment and placement, including any interim placement pending the hearing. . . . [¶] In light of these principles and authorities, we conclude that someone like Barrett, who is alleged to be mentally retarded and dangerous under section 6500, is not in a position to personally assert or waive the right to jury trial, to sufficiently comprehend the jury trial advisement, or to override the views of counsel on the subject. Sole control over such tactical and procedural decisions rests with counsel, whether or not the client has been consulted or objects." (*Barrett, supra*, 54 Cal.4th at pp. 1104-1105.)

*Masterson* and *Barrett* establish that in certain types of commitment proceedings, the defendant's alleged mental state—e.g., incompetency and mental retardation—disables the defendant from making reasoned decisions concerning what is in his or her best interests, including whether to request or waive a jury trial. In other words, it is

18

reasonable to categorically assume that such defendants lack the capacity to make a rational decision about a jury trial. For that reason, they must act through counsel, and counsel has exclusive control over the jury issue.

The Attorney General cites *Masterson* to support the claim that counsel has exclusive control in MDO proceedings. Presumably, the argument is that, like defendants whose competence has been questioned or persons diagnosed with mental retardation, MDOs are categorically unable to make reasoned decisions, and therefore counsel must be able to decide the jury issue. We reject this argument and find the Attorney General's reliance on *Masterson* to be misplaced.

First, there are significant differences between an MDO extension trial and the proceedings in *Masterson* and *Barrett.* The purpose of a competency trial is to resolve actual doubt concerning the defendant's mental capacity to understand the proceedings and cooperate with and assist counsel. (*People v. Lewis* (2008) 43 Cal.4th 415, 524.) Thus, as *Masterson* holds, once a defendant's competency is doubted, counsel has control over whether to request a jury for the competency trial.

The proceeding in *Barrett* did not involve a determination of competency but whether a mentally retarded person is dangerous. However, as *Barrett* explains, mental retardation in this context represents a permanent developmental disability involving significant cognitive and intellectual deficits. For this reason, the court treated the allegations and supporting documentation that a person is mentally retarded like doubt concerning a defendant's competency to stand trial. In other words, the mentality of persons in both contexts is comparable, both may be assumed to be incapable of determining their own best interests, and therefore the scope of counsel's authority should be the same.

Unlike a competency trial, an MDO trial does not involve a determination of competency. Its purpose is to determine whether an MDO is currently dangerous due to a

19

severe mental disorder that is not in remission. (§ 2970.) To be sure, that purpose mirrors that of a trial to commit a dangerous mentally retarded person. However, the similarity of purpose does not mean that the scope of counsel's authority should be the same because the mental capacity of the persons in each context is different. More specifically, although it may be reasonable to categorically assume that mentally retarded persons lack the capacity to determine their own best interests, it is not reasonable to make that categorical assumption about MDOs. *Barrett* makes this precise point.

Concerning the capacity to function in a competent manner, and specifically to comprehend a jury advisement and rationally control the jury decision, the *Barrett* court distinguished those diagnosed with a mental disease, defect, or disorder from those diagnosed with mental retardation.

In *Barrett*, the defendant claimed that the Constitution required a jury advisement and personal waiver under principles of equal protection. She noted that patients facing an extended commitment under the Lanterman-Petris-Short (LPS) Act (Welf. & Inst. Code, § 5000 et seq.) because they posed a danger due to their mental disease, defect, or disorder rendered were statutorily entitled to such procedural safeguards. (*Barrett, supra*, 54 Cal.4th at p. 1106; see Welf. & Inst. Code, § 5302.) Because she and LPS patients were similarly situated, she claimed the right to those safeguards.

In rejecting her claim, the court explained that persons subject to commitment under the two schemes are not "similarly situated as to the ancillary purpose that an express jury trial advisement, and an express personal waiver, purportedly serve," namely enabling the person to comprehend and control the decision to waive a jury trial. (*Barrett, supra*, 54 Cal.4th at p. 1108.) What distinguished persons under the two schemes was their "distinct 'mentality' "—i.e., mental retardation versus mental illness. (*Ibid*.) The court explained that "[m]ental illness and related disorders are said to be conditions that may arise suddenly and, for the first time, in adulthood. [Citation.] The

20

LPS Act process itself assumes that the need for treatment may be temporary, and that disabling mental disorders may be intermittent or short-lived. [Citation.] [¶] In addition, because of the complexity of human behavior, and the lack of a long history in every case, mental illness and related disorders may be difficult to diagnose. [Citations.] Where present, however, ' "mental illness 'often strikes only limited areas of functioning, leaving other areas unimpaired, and consequently . . . *many mentally ill persons retain the capacity to function in a competent manner*.' " ' [Citation.] [¶] These characteristics suggest that the mental conditions that create eligibility for an extended 180-day LPS Act commitment, though they include imminent dangerousness, *do not necessarily imply incompetence or a reduced ability to understand, and make decisions about, the conduct of the proceedings*. Hence, nothing compels the conclusion that such LPS Act patients will not benefit by the statutory right to a jury trial advisement set forth in section 5302. By contrast, in the case of persons alleged to be mentally retarded and dangerous under section 6500, the commitment process itself raises substantial doubts about their cognitive and intellectual functioning sufficient to limit the personal and procedural role they play. It follows that the two groups are not similarly situated as to the function that Barrett implies an advisement like section 5302 serves—*comprehending and controlling the decision whether to request a jury trial*. Thus, any disparate statutory treatment with respect to jury trial advisements does not deprive persons like Barrett of equal protection of the law." (*Barrett, supra*, 54 Cal.4th at pp. 1108-1109, first italics in *Barrett,* second italics added.)[9]

---

[9] In 1981, the court in *Cramer v. Gillermina R., supra,* 125 Cal.App.3d 380 similarly held that because "mental illness and mental retardation are separate and distinct conditions which require different treatment and/or habilitation," their differing statutory schemes did not violate equal protection. (*Id*. at pp. 387-388; accord, *People v. Quinn* (2001) 86 Cal.App.4th 1290, 1294-1295.)

The court's discussion recognizes that unlike defendants whose competence is questioned or persons diagnosed with mental retardation, those suffering from a mental illness can comprehend and control the decision to waive a jury trial. In this regard, *Barrett's* view mirrors the implicit legislative finding underlying the statutory requirements of an advisement and jury trial unless waived, namely, that MDOs are competent to comprehend and control the jury decision. Moreover, those requirements further distinguish *Masterson* and *Barrett* because the statutes in those cases do not have similar requirements and instead require that a jury be requested. (*Barrett, supra,* 54 Cal.4th at p. 1097; *People v. Rojas* (1981) 118 Cal.App.3d 278, 287; *People v. Hill, supra*, 67 Cal.2d at p. 114 [under former § 1368]; e.g., *People v. Superior Court* (*McPeters*) (1985) 169 Cal.App.3d 796, 798.)

Finally, *Barrett's* view that having a mental disorder does not categorically render one incapable of determining what is in his or her own best interests is not particularly unique or unprecedented. In *John L., supra,* 48 Cal.4th 131, the court observed that despite having mental disorders, conservatees are not, by reason of their conservatorship, automatically considered incompetent to waive their rights. (*Id*. at p. 153.) In *Qawi, supra,* 32 Cal.4th 1, the court opined that "[a]lthough an MDO must be determined to have a 'severe mental disorder,' commitment for a mental disorder does not by itself mean that individuals are incompetent to participate in their own medical decisions. [Citations.]" (*Id*. at p. 24.) In *People v. Wolozon* (1982) 138 Cal.App.3d 456, the court held that despite a finding of NGI and evidence of a mental disorder that rendered the defendant dangerous, the defendant had the right to waive counsel and represent himself. (*Id*. at pp. 460-461.) Similarly, in *People v. Williams* (2003) 110 Cal.App.4th 1577 the court recognized that a defendant has the statutory right to waive counsel and represent himself in a trial to extend his commitment as an MDO. (*Id*. at pp. 1587-1592.)

22

In addition to *Masterson*, the Attorney General relies on *Otis* and *Montoya* as support for counsel's exclusive control. Again, however, the Attorney General's reliance is misplaced.

We understand *Otis* and *Montoya* in light of the specific facts and issues in those cases. (See *Ginns v. Savage* (1964) 61 Cal.2d 520, 524, fn. 2 ["[l]anguage used in any opinion is of course to be understood in the light of the facts and the issue then before the court"].) As noted, in *Otis*, the court upheld counsel's decision to waive a jury trial over the defendant's objection. However, the defendant was delusional, and the court opined that he was not capable of making a reasoned decision. (*Otis*, *supra*, 70 Cal.App.4th at pp. 1175-1176.) In *Montoya*, the court also upheld counsel's waiver. However, it opined, in essence, that because the defendant's mind was not functioning normally, he, like the defendant in *Otis*, was incapable of making a reasoned decision between a bench and jury trial. (*Montoya, supra*, 86 Cal.App.4th at p. 831.)

Given facts in *Otis* and *Montoya*, we read them for the proposition that when an MDO appears to be incapable of determining whether a bench or jury trial is in his or her best interests, the MDO must act through counsel, and counsel has exclusive authority to decide even over the MDO's objection. Neither case, however, should be read more broadly to hold that counsel controls the jury issue regardless of whether the MDO is competent to understand the advisement and make a reasoned decision. This is especially so because neither case addressed the purpose and function of the mandatory jury advisement.

We review another case that is pertinent to our discussion—*Powell, supra,* 114 Cal.App.4th 1153—because it involved a "special proceeding" to extend the commitment of a defendant who had been found not guilty by reason of insanity (NGI) under section 1026, which also provides the right to a jury trial and requires a jury advisement

23

and a jury trial "unless waived by both the person and the prosecuting attorney." (§ 1026.5, subds. (b)(3) & (b)(4).)

In *Powell*, the defendant objected to counsel's waiver and requested a jury, and when the court denied the request, the defendant became so argumentative, belligerent, and disruptive that he had to be removed from the courtroom. On appeal, the defendant claimed that counsel's waiver was ineffective because the statute required a personal waiver. (*Powell*, *supra,* 114 Cal.App.4th at pp. 1157-1158.)

In upholding counsel's waiver over the NGI's objection, the court opined generally that "[a]n insane person who is 'a substantial danger of physical harm to others' [citation] should not be able to veto the informed tactical decision of counsel." (*Powell*, *supra,* 114 Cal.App.4th at p. 1158.) The court then pointed out that the defendant had been found insane twice, medical staff had diagnosed him with paranoid schizophrenia, and there was no evidence he had regained his sanity. The court further noted that the defendant had a history of violence, believed certain people should be killed, and sought release to do so. (*Id*. at p. 1158.) The court asked, "Can such a person intelligently invoke or waive the right to a jury trial? Is such a person competent to meaningfully understand who should make the determination of whether his commitment should be extended?" (*Ibid*.) The court answered, "Common sense dictates that appellant should not be able to veto his attorney's decision to waive a jury. The record demonstrates that appellant was suffering from a severe mental disorder. On the day of the purported demand for jury, appellant was medicated, experiencing mood swings, and was so belligerent and disruptive that he had to be removed from the courtroom." (*Ibid*.)

In support of its analysis, the *Powell* court cited *Angeletakis, supra,* 5 Cal.App.4th 963. There, the defendant faced a trial to extend his NGI commitment and sought a preliminary determination of his competence. (See § 1368.) The court noted that section 1368 did not apply in civil proceedings and opined that an NGI did not have to be

24

competent at a trial to extend his or her commitment. (*Id*. at pp. 967-968; *Juarez v. Superior Court* (1987) 196 Cal.App.3d at pp. 931-932 [same]; cf. *People v. Moore* (2010) 50 Cal.4th 802 [trial on commitment as SVP does not require the defendant's competence].) As the court explained, "Angeletakis will be confined and receive treatment for his mental condition whether his commitment is extended under section 1026.5 or such proceedings are suspended under section 1368. While we appreciate the distinction between mental competence to stand trial and dangerousness to others due to a mental disease, defect, or disorder, we think the interests of a person facing a commitment extension are adequately protected by competent counsel and the other procedural safeguards afforded him. Requiring the court to suspend proceedings until the committee is able to understand the nature of the proceedings and assist in the conduct of his 'defense' adds minimal protection in this context, especially when balanced against the administrative burdens involved." (*Angeletakis, supra,* 5 Cal.App.4th at pp. 970-971, fn. omitted.)

The *Powell* court read *Angeletakis* "for the principle that an NGI committee who is not mentally competent *must act* through counsel. If the person is not competent to waive jury at the extension trial, his or her attorney may waive jury on his or her behalf. *That is the case here*." (*Powell, supra,* 114 Cal.App.4th at p. 1158, second italics added.) The *Powell* court also relied on *Otis*, agreeing that the Legislature could not have intended to leave the jury decision in the hands of a person incapable of determining what was in his or her best interests. (*Id*. at p. 1159.)

As our review reveals, the holding in *Powell*—i.e., that counsel had the authority to waive a jury over the NGI's objection—rested on the particular circumstances of that case which demonstrated that the NGI lacked the capacity to determine what was in his own best interests.

*Otis*, *Montoya,* and *Powell* are strikingly similar in holding that when an MDO's or NGI's mental capacity is reasonably called into question, he or she must act through counsel, and counsel controls the jury decision. In this regard, *Otis*, *Montoya*, and *Powell* reflect the *Masterson-Barrett* rationale for recognizing counsel's exclusive authority.

We consider it helpful at this point to summarize our resolution of the parties' interlocking but opposing claims and our conclusion concerning the meaning of the waiver provision and the scope of counsel's authority. The provision does not require an MDO's personal waiver or give counsel exclusive control over whether to have a jury trial. Nor does the nature of an MDO proceeding reasonably warrant giving counsel such exclusive control. Rather, counsel can waive a jury trial at the MDO's direction or with the MDO's knowledge and consent; and counsel can do so even over an MDO's objection when the circumstances cast reasonable doubt on the MDO's mental capacity to determine what is in his or her best interests.

We now return to defendant's claim that the court committed reversible error in conducting a bench trial.

## C.  Error and Prejudice

The propriety of defendant's bench trial turns on the validity of counsel's waiver, which in turn hinges on whether defendant knew he had the right to a jury trial and directed or knowingly consented to counsel's waiver.[10]

The court did not advise the defendant of his right to jury trial on the record before the bench trial; and we can reasonably infer that it did not do so off the record because defendant first appeared in court on the day of the trial. The court's custom and practice of obtaining waivers off the record resulted in a record that is silent concerning whether counsel discussed the jury issue with defendant, or if he did, whether defendant agreed to

---

[10] The record does not establish that during the pretrial period defendant was so affected by his mental disease as to raise doubt about his capacity to determine what was in his own best interests.

26

have a bench trial or wanted a jury trial instead.  Nevertheless, on appeal, we are bound by established rules of appellate review.

Before any judgment can be reversed for error under state law, it must appear that the error complained of "has resulted in a miscarriage of justice."  (Cal. Const., art. VI, § 13; *Cassim v. Allstate Ins. Co.* (2004) 33 Cal.4th 780, 801.)  This means that reversal is justified "when the court, 'after an examination of the entire cause, including the evidence,' is of the 'opinion' that it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error."  (*People v. Watson* (1956) 46 Cal.2d 818, 836 (*Watson*).)

Moreover, "[i]t is a well established rule in this state that 'an appellate court will never indulge in presumptions to defeat a judgment.  It will never presume that an error was committed, or that something was done or omitted to be done which constitutes error.  On the contrary, every intendment and presumption not contradicted by or inconsistent with the record on appeal must be indulged in favor of the orders and judgments of superior courts.'  [Citation.]"  (*Walling v. Kimball* (1941) 17 Cal.2d 364, 373; accord, *Keener v. Jeld-Wen, Inc.* (2009) 46 Cal.4th 247, 261; *People v. Giordano* (2007) 42 Cal.4th 644, 666; see Code Civ. Proc. § 475.)  Accordingly, the appellant bears the burden to affirmatively establish error and then demonstrate that it resulted in a miscarriage of justice that requires reversal.  (*Cucinella v. Weston Biscuit Co.* (1954) 42 Cal.2d 71, 82; *Freeman v. Sullivant* (2011) 192 Cal.App.4th 523, 528; *Paterno v. State of California* (1999) 74 Cal.App.4th 68, 105-106; *Thompson v. Thames* (1997) 57 Cal.App.4th 1296, 1308; see 9 Witkin, Cal. Procedure (5th ed. 2008) Appeal, § 355, p. 409 [presumption of correctness; "error must be affirmatively shown"].)

Although it does not appear that the court advised defendant as required, counsel waived defendant's presence at every pretrial hearings, effectively precluding compliance with the statutory duty to advise.  However, when counsel waives an MDO's presence,

27

the court can reasonably expect counsel to discuss all pertinent matters that will arise or that have arisen in pretrial hearings, including the right to a jury trial and whether to have one. Indeed, "[l]ike all lawyers, the court-appointed attorney is obligated to keep her client fully informed about the proceedings at hand, *to advise the client of his rights*, and to vigorously advocate on his behalf. [Citations.] The attorney must also refrain from any act or representation that misleads the court. (Bus. & Prof.Code, § 6068, subd. (d); Rules Prof. Conduct, rule 5-200(B).)" (*John L.*, *supra*, 48 Cal.4th at pp. 151-152, italics added.) Absent a showing to the contrary, "[a] reviewing court will indulge in a presumption that counsel's performance fell within the wide range of professional competence and that counsel's actions and inactions can be explained as a matter of sound trial strategy." (*People v. Carter* (2003) 30 Cal.4th 1166, 1211; *Conservatorship of Ivey* (1986) 186 Cal.App.3d 1559, 1566; e.g., *Mary K, supra,* 234 Cal.App.3d at p. 272 [where no evidence to the contrary, court presumed counsel discussed jury waiver with client before waiving on client's behalf].)[11]

Finally, we note that this was not the first extension of defendant's MDO commitment, and the record does not suggest that defendant was unaware of his right to a jury trial notwithstanding the lack of a judicial advisement. Nor does the record suggest that defendant was unaware that counsel intended to waive a jury and had done so or that defendant wanted a jury trial and objected (or would have objected) to counsel's waiver.

---

[11] We do not intend to suggest that it was improper or inappropriate for counsel to waive defendant's presence or that the court had a duty to order defendant's presence in order to directly advise him. However, a direct advisement is not the only way for the court to ensure that an MDO is made aware of the right to a jury trial. In our view, the practical difficulty in advising an MDO committed to a state hospital could easily be solved with an advisement and waiver form for the MDO to read and sign. (See *People v. Ramirez* (1999) 71 Cal.App.4th 519, 521-522 [waiver form proper substitute for judicial advisement].)

28

Here, any such inferences would be pure speculation on our part.[12] Moreover, "[a]s a general rule, a stipulation of the attorney will be presumed to have been authorized by the client, as well in order to uphold the action of the court, as for the protection of the other party to the stipulation; but when the adverse party, as well as the court, is aware the attorney is acting in direct opposition to his client's instructions or wishes, the reason of the rule ceases, and the court ought not to act upon the stipulation, nor can the adverse party claim the right to enforce a judgment rendered by reason thereof." (*Knowlton v. Mackenzie* (1895) 110 Cal. 183, 188.)

Last, it is settled that the erroneous denial of a statutory right to a jury trial is subject to harmless-error review under the *Watson*[13] test which asks whether it is reasonably probable the result would have been more favorable had there been a jury trial. (*People v. Epps* (2001) 25 Cal.4th 19, 29.)

We note that a single opinion by a psychiatric expert that the defendant is currently dangerous due to a mental disorder can constitute substantial evidence to support the extension of a commitment. (*People v. Zapisek* (2007) 147 Cal.App.4th 1151, 1165; *People v. Bowers* (2006) 145 Cal.App.4th 870, 879.)

Dr. Perry's testimony constituted overwhelming evidence to support a finding that defendant posed an unreasonable risk of harm to others due to his mental disorder and history of violent behavior. Among other things, he reported that within the previous few weeks, defendant had exhibited delusional and irrational thinking and impulsive and

---

[12] If, in fact, defendant was unaware of his right to a jury trial and would have opposed or did oppose counsel's waiver, but the evidence to establish these facts lay outside the record on appeal, defendant had the alternative a remedy of habeas corpus to challenge his commitment on the ground of ineffective assistance of counsel. (See *People v. Gray* (2005) 37 Cal.4th 168, 211 [claims grounded in facts outside the record can be raised by habeas petition]; *In re Bower* (1985) 38 Cal.3d 865, 872.)

[13] *Watson, supra,* 46 Cal.2d 818, 836.

bizarre behavior similar to that which had accompanied his commitment offense. Defendant did not present an expert to testify that he was not currently dangerous. Nor did he present evidence that contradicted or impeached Dr. Perry. Moreover, defendant does not claim that Dr. Perry's opinion was speculative or that his testimony does not constitute substantial evidence.

Under the circumstances and even if we assume error in failing to advise and conducting a jury trial, we do not consider it reasonably possible, let alone reasonably probable, that defendant would have obtained a more favorable result had the court expressly advised him and conducted a jury trial. (*Watson, supra,* 46 Cal.2d at p. 836; e.g., *People v. Cosgrove* (2002) 100 Cal.App.4th 1266, 1276 [denial of statutory right to MDO trial harmless]; cf. *People v. McClellan* (1993) 6 Cal.4th 367, 377, 378 [failure to advise about sex registration requirement harmless].)

## VII. PROTECTING THE RIGHT TO A JURY TRIAL

As our discussion reveals, the court's custom and practice in commitment cases resulted in a record that does not affirmatively establish the validity of counsel's waiver and the ensuing bench trial. It does not show whether defendant knew he had the right to jury trial and whether counsel waived at defendant's direction or with his consent. In fact, the record initially did not even reveal that counsel expressly waived a jury trial. The silence of the record, together with the presumptions that guide appellate review and the harmless error test, made defendant's appellate burden an insurmountable hurdle and effectively assured affirmance regardless of whether defendant was aware of his right and whether counsel's waiver was valid. Indeed, where, as here, there is overwhelming evidence to support the extension of a commitment, a reviewing court need not even concern itself with whether the MDO knew about the right to a jury trial or whether counsel waived jury without the MDO's knowledge and consent or over the MDO's

objection because any alleged errors can easily be deemed harmless under *Watson*. However, we find this troubling.

The United States Supreme Court has repeatedly recognized that civil "commitment for any purpose constitutes a significant deprivation of liberty that requires due process protection." (*Foucha v. Louisiana* (1992) 504 U.S. 71, 80.) "Moreover, it is indisputable that involuntary commitment to a [psychiatric] hospital after a finding of probable dangerousness to self or others can engender adverse social consequences to the individual. Whether we label this phenomen[on] 'stigma' or choose to call it something else is less important than that we recognize that it can occur and that it can have a very significant impact on the individual." (*Addington v. Texas* (1979) 441 U.S. 418, 425-426; *People v. Allen* (2007) 42 Cal.4th 91, 98.)

Given the similar liberty and dignity interests implicated at stake in an involuntary commitment, the right to choose the trier of fact is no less valuable to an MDO than it is to a criminal defendant. Moreover, although no constitutional provision guarantees an MDO the right to a jury trial, the Legislature nevertheless considered the right important enough to require a judicial advisement and a jury trial unless validly waived.

In our view, the purpose of these mandates is frustrated and an MDO's right to a jury trial is undermined when together a silent record, general procedural rules and presumptions on appeal, and the harmless-error test permit a reviewing court to affirm a commitment and say, in essence, we need not know, and it does not matter whether the MDO was advised or whether a jury trial was validly waived. Rather, compliance with the statutory mandates matters even when there is overwhelming evidence to support a commitment order and the failure to comply with the statute can been deemed harmless error.

The best assurance of compliance is a record that reflects it. Accordingly, we consider it appropriate to adopt a rule requiring the court and the parties to make a record

31

that affirmatively establishes the propriety of a bench trial. (See *McDonald v. Antelope Valley Community College Dist.* (2008) 45 Cal.4th 88, 99-100 [recognizing inherent judicial authority to create procedural rules when necessary].)[14] In particular, we hold that if the court conducts a bench trial and the MDO did not personally waive the right to a jury, the record must show that the court advised the MDO of the right to a jury or, if the court was unable to do so, that the MDO was made aware of the right *before* counsel waived it. The record must also show that in waiving a jury trial, counsel acted at the MDO's direction or with the MDO's knowledge and consent or that there were circumstances before the court that reasonably raised doubt concerning the defendant's capacity to determine what was in his or her own best interests.

Finally, a procedural rule requiring a clear and explicit record concerning the advisement and waiver requirements imposes little if any additional burden on the court and parties. What slight burden it might impose is clearly outweighed by the importance the Legislature has attached to an MDO's right to a jury trial and the statutory requirements designed to protect it. In this regard we note that the court may still resolve the jury issue in accordance with its custom and practice. At some point, however, the court and parties must state on the record the facts establishing the MDO's awareness of the right to a jury and the validity of counsel's waiver. Alternatively, the record must contain an advisement and waiver form signed by the MDO.[15]

---

[14] E.g., *People v. Sumstine* (1984) 36 Cal.3d 909, 914 [creating a rule of procedure permitting a defendant to collaterally attack the validity of a prior felony conviction on the ground he was not advised of, or did not knowingly and voluntarily waive, his rights in the prior plea proceeding]; *Bunnell v. Superior Court* (19175) 13 Cal.3d 592, 605 [creating procedural rule requiring advisements in all submission cases]; *In re Yurko* (1974) 10 Cal.3d 857, 863-864 [creating rule requiring advisement about the consequences of admitting prior conviction allegation].)

[15] We note that recently, during oral argument in a similar MDO case, the Attorney General conceded that that it would be helpful in resolving similar disputes if the parties or the court would express on the record the status of the defendant's mental

## VIII. Disposition

The order extending defendant's MDO commitment is affirmed.

_____

RUSHING, P.J.

I CONCUR:

_____

PREMO, J.

---

acuity, his understanding of his jury trial right, and his ability to comprehend and cooperate with his attorney's efforts.

ELIA, J, concurring:

I respectfully concur in the judgment on the ground no reversible error has been shown.  (Cal. Const., art. VI, § 13; *People v. Watson* (1956) 46 Cal.2d 818, 836.)  A trial court's judgment or order is presumed correct.  (*Denham v. Superior Court* (1970) 2 Cal.3d 557, 564.)  " '. . . All intendments and presumptions are indulged to support it on matters as to which the record is silent, and error must be affirmatively shown.  This is not only a general principle of appellate practice but an ingredient of the constitutional doctrine of reversible error.' [Citations.]"  (*Ibid.*)

On the appellate record before us, we must presume that appellant knew of his right to a jury trial and he consented to a court trial.  Consequently, it is unnecessary to decide whether counsel may waive a competent client's right to jury trial under the Mentally Disordered Offender (MDO) Act only at the client's direction or with the client's consent.  (See Pen. Code, §§ 2970, subd. (b), 2972, subd. (a).)  As the U.S. Supreme Court stated:  "The duty of this court, as of every other judicial tribunal, is to decide actual controversies by a judgment which can be carried into effect, and not to give opinions upon moot questions or abstract propositions, or to declare principles or rules of law which cannot affect the matter in issue in the case before it."  (*Mills v. Green* (1895) 159 U.S. 651, 653 [16 S.Ct. 132]; see *Eye Dog Foundation v. State Board of Guide Dogs for the Blind* (1967) 67 Cal.2d 536, 541.)

Further, it is not apparent that appellate courts enjoy general supervisory authority over superior courts' practice and procedure.  "The judicial power of this State is vested in the Supreme Court, courts of appeal, and superior courts, all of which are courts of record."  (Cal. Const., art. VI, § 1.)  The California Constitution makes the Judicial Council, which is chaired by the Supreme Court's Chief Justice, responsible for adopting "rules for court administration, practice and procedure" not "inconsistent with statute."  (Cal. Const., art. VI, § 6, subd. (d); see Cal. Rules of Court, rule 10.1.)

By statute, "[e]very court may make rules for its own government and the government of its officers not inconsistent with law or with the rules adopted and prescribed by the Judicial Council."  (Gov. Code, § 68070; see Code Civ. Proc., § 575.1 [promulgation of local court rules].)  The Legislature has encouraged the "Judicial Council . . . to adopt rules to provide for uniformity in rules and procedures throughout all courts in a county and statewide."  (Gov. Code, § 68070, subd. (b).)

Some of the powers of courts are set out by statute.  (See e.g. Code Civ. Proc., §§ 128, subd. (a) [courts' powers], 177 [judicial officers' powers].)  Code of Civil Procedure section 187 provides: "When jurisdiction is, by the Constitution or this Code, or by any other statute, conferred on a Court or judicial officer, all the means necessary to carry it into effect are also given; and in the exercise of this jurisdiction, if the course of proceeding be not specifically pointed out by this Code or the statute, any suitable process or mode of proceeding may be adopted which may appear most conformable to the spirit of this code."

"Courts have inherent power, as well as power under section 187 of the Code of Civil Procedure, to adopt any suitable method of practice, both in ordinary actions and special proceedings, if the procedure is not specified by statute or by rules adopted by the Judicial Council."  (*Tide Water Associated Oil Co. v. Superior Court of Los Angeles County* (1955) 43 Cal.2d 815, 825, fn. omitted.)  " 'In addition to their inherent equitable power derived from the historic power of equity courts, all courts have inherent supervisory or administrative powers which enable them to carry out their duties, and which exist apart from any statutory authority.  [Citations.] . . .'  [Citation.]"  (*Rutherford v. Owens-Illinois, Inc.* (1997) 16 Cal.4th 953, 967.)

On occasion, the California Supreme Court has invoked its "inherent authority" to establish statewide judicial rules or procedures.  In *In re Roberts* (2005) 36 Cal.4th 575, the Supreme Court explained that it "has inherent authority to establish 'rules of judicial

2

procedure to be followed by superior courts' in exercising their territorially unlimited jurisdiction over habeas corpus petitions.  ([*Griggs v. Superior Court* (1976) 16 Cal.3d 341,] 347 . . . ; see also *People v. Pena* (2004) 32 Cal.4th 389, 398-399, 403 . . . [in the exercise of supervisory power over state courts, directing the Court of Appeal to refrain from utilizing an oral argument waiver notice]; *People v. Burgener* (2003) 29 Cal.4th 833, 861 . . . [in the exercise of supervisory power over state criminal procedure, prohibiting trial courts from making race-conscious assignments of prospective jurors]; *People v. Engelman* (2002) 28 Cal.4th 436, 449 . . . [in the exercise of supervisory power over the courts, directing trial courts to refrain from instructing juries pursuant to CALJIC No. 17.41.1 on the obligation of jurors to advise the court of certain juror conduct].)"  (*Id.* at p. 593; see *In re Reno* (2012) 55 Cal.4th 428, 522 [given the Supreme Court's "unique role in overseeing the imposition of capital punishment in this state, [fn.] [the Supreme Court] a fortiori possesses inherent power to control potential abuses of the writ process"].)  The court has also recognized its own supervisory authority over state criminal procedure.  (See *In re Podesto* (1976) 15 Cal.3d 921, 938 [high court held, pursuant to its supervisory authority over state criminal procedure, that trial courts should render a brief statement of reasons in support of an order denying a motion for bail on appeal]; *People v. Kelly* (2006) 40 Cal.4th 106, 110 [in the exercise of its "supervisory power over the courts of this state," California Supreme Court directed the Courts of Appeal to "include in their *Wende* opinions a brief description of the facts and procedural history of the case, the crimes of which the defendant was convicted, and the punishment imposed. . . ."  ], see *id*. at pp. 123-124.)

The majority in this case has not cited case law establishing that California appellate courts inherently have general supervisory authority over superior courts within their districts.  *McDonald v. Antelope Valley Community College Dist.* (2008) 45 Cal.4th 88, the principal case relied on by the majority in this regard, does not establish such

authority. In that case, the Supreme Court held that the Fair Employment and Housing Act "does not preclude equitable tolling during the voluntary pursuit of internal administrative remedies." (*Id*. at p. 111.) The court discussed the judicially created, nonstatutory doctrine of equitable tolling of statutes of limitations and noted that it had previously "described it as a creature of the judiciary's inherent power ' "to formulate rules of procedure where justice demands it." ' [Citations.]" (*Id*. at p. 100, fn. omitted; see *Lantzy v. Centex Homes* (2003) 31 Cal.4th 363, 370 ["effect of equitable tolling is that the limitations period *stops running* during the tolling event, and begins to run again only when the tolling event has concluded"].)

I can endorse the majority's rules as nonbinding, recommended practices to the extent they are helpful in avoiding unnecessary appeals but not as procedural rules controlling local courts.

_____

ELIA, J.

*People v. Blackburn*

H037207

4

| Trial Court: | Santa Clara County Superior Court No.: BB304666 |

Trial Court:                          Santa Clara County
                                      Superior Court No.:  BB304666


Trial Judge:                          The Honorable Gilbert T. Brown


Attorney for Defendant and Appellant  Rudy Kraft
Bruce Lee Blackburn:                  under appointment by the Court of
                                      Appeal for Appellant


Attorneys for Plaintiff and Respondent  Kamala D. Harris
The People:                             Attorney General

                                        Dane R. Gillette,
                                        Chief Assistant Attorney General

                                        Gerald A. Engler,
                                        Senior Assistant Attorney General

                                        Seth K. Schalit,
                                        Supervising Deputy Attorney General

                                        John H. Deist,
                                        Deputy Attorney General


***People v. Blackburn***
**H037207**