[Sac. No. 5130. In Bank.—September 1, 1938.]

ZURICH GENERAL ACCIDENT AND LIABILITY IN-SURANCE COMPANY, LTD., Plaintiff, v. ANNA KIN-SLER et al., Defendants; KEITH C. EVERSOLE, Cross-Complainant and Appellant, v. MAURICE E. KINSLER et al., Cross-Defendants and Respondents.

W. H. Brunner for Appellant.

Carlton D. Dethlefscn and Harry W. Horton, as *Amici Curiae* on Behalf of Appellant.

Phillips & Munck and James H. Phillips for Respondents.

HOUSER, J.—The pertinent facts herein appear to be that following a personal injury which theretofore she had sustained in an accident, the defendant Mrs. Anna Kinsler, employed the defendant Eversole as an attorney at law to bring an action for the purpose of recovering a judgment against the person who was asserted to have been negligent in having caused said accident to occur. By the terms of the said contract, the compensation therein provided to be paid to said Eversole was contingent and, in effect, provided that the latter was to be paid for the services which he thereafter might render to Mrs. Kinsler in said matter to the extent

and in the amount of one-third of whatever judgment that might be rendered in the action in her favor. Eversole not only brought the action, but also performed other services in connection therewith, which included his presence and services in the taking of the deposition of Mrs. Kinsler. Thereafter, by reason of certain misconduct asserted to have occurred on the part of Eversole, Mrs. Kinsler notified him that he was discharged from thereafter acting as her attorney in the action. Three days after having received such notice of said discharge, on the initiative of Mrs. Kinsler, Eversole consented in writing to the substitution of other attorneys in the litigation,—at the same time, in substance, orally informing Mrs. Kinsler that he waived none of his legal rights which purportedly had been conferred upon him by the terms of his contract of employment.

The result of the subsequent trial of the action was that Mrs. Kinsler was awarded a judgment for the sum of $2,000; which amount the insurer of the judgment debtor deposited in court and thereupon brought the instant action by which Mrs. Kinsler and Eversole were interpleaded for the purpose of having their respective rights in said sum determined by the court. From a judgment that was rendered in that action in favor of Eversole for the sum of $75 he has appealed to this court.

For the reason that such statutory provisions as are contained in section 284 of the Code of Civil Procedure, as amended in 1935, were not a part of that statute at the time when the rights of the respective parties herein accrued, it becomes unnecessary to devote attention to any of such provisions.

By the force of a number of decisions which heretofore have been rendered by the appellate courts of this state, the law which has obtained with reference to a situation such as is presented by the instant record appears to have been well established to the effect that where, with respect to compensation for services thereafter to be performed, an attorney who was employed under a contingent contract, dependent upon the successful outcome of the particular business in which such services were proposed to be rendered, was discharged *"without cause"*,—in an action for damages for such breach of contract thereafter brought by the attorney against his former client,—based upon the amount recovered

in the action in which the attorney was discharged, he was entitled to recover a judgment for the full amount that was provided by the terms of such contract. (*Baldwin* v. *Bennett,* 4 Cal. 392; *Webb* v. *Trescony,* 76 Cal. 621 [18 Pac. 796]; *Countryman* v. *California Trona Co.,* 35 Cal. App. 728 [170 Pac. 1069]; *McCully* v. *Gano,* 116 Cal. App. 695, 698 [3 Pac. (2d) 348]; see, also, as recognizing the rule: *Green* v. *Sherritt,* 17 Cal. App. (2d) 732, 736 [62 Pac. (2d) 769]; *Elconin* v. *Yalen,* 208 Cal. 546, 549 [282 Pac. 791]; *Kirk* v. *Culley,* 202 Cal. 501, 506 [261 Pac. 994].)

That part of the law which is applicable herein being established, the remaining question for determination relates to whether the attorney was discharged "without cause".

With respect to a determination of whether the discharge of an attorney has been "without cause", it is obvious that no precise act or fixed line of conduct on the part of the attorney may be accurately defined or specified as furnishing a sufficient reason for an application of the rule against him. Manifestly, "cause" which in legal contemplation would justify the cancellation of a contingent contract for compensation on account of legal services thereafter to be rendered, necessarily would have to depend upon the particular circumstances that were present in each case. In that regard, it is not improbable that its determination very properly might relate to "time, place and persons". A single act which had occurred at a certain time, at a designated place, and in the presence of specified persons, in all propriety might possibly be termed entirely out of keeping with the orderly and dignified conduct by which an attorney should demean himself, under different circumstances might present an entirely different aspect. It thus may become apparent that the question whether "cause" for the abrogation of such a contract exists or has existed may be one of fact; and it also should be clear that in connection with the facts which may be established, a legal question as to their sufficiency is more than likely to ensue. That is to say, that a conclusion with reference to the ultimate question of fact necessarily must rest upon substantial and sound reasons therefor, and not be made to depend upon mere whim, caprice, or arbitrary judgment. It is apparent that to judicially declare, without limitation, that for "cause" a covenant of contingent compensation to be paid to an attorney may be broken with impunity and with-

out consequent pecuniary liability, in itself is so broad, elastic and so lacking in desirable precision, that if unrestrained and unrestricted would be but to open the door to the perpetration of fraud. ■ The "cause" must be not only "good", but it also must be legally sufficient. As was said in *Cummer* v. *Butts*, 40 Mich. 322, 325 [29 Am. Rep. 530], "good cause", as used in a contract stipulating that it might be canceled by either party for good cause, "has no such distinct sense as to furnish a common and intelligible criterion for the parties, or any determinate sense whatever". Also in the case of *State* v. *Common Council of City of Duluth*, 53 Minn. 238 [55 N. W. 118, 120, 39 Am. St. Rep. 595], it is said, " 'Cause' or 'sufficient cause' (to authorize a removal from office of a city officer) means 'legal cause', and not any cause which the council may think sufficient." Where, however, it appears that conduct of an attorney has been such that by reason thereof, the dignity of the profession has been seriously affronted with respect and germane to the subject matter of the contract, "good cause" may exist; and in that connection, acts of impropriety that clearly are inconsistent with a faithful, proper and dignified discharge of his duties as an attorney and officer of the court, may furnish a sufficient justification for the termination of a contract of employment. (*Ingersoll* v. *Coal Creek Coal Co.*, 117 Tenn. 263 [98 S. W. 178, 119 Am. St. Rep. 1003, 10 Ann. Cas. 829, 9 L. R. A. (N. S.) 282]; *Hoboken Trust Co.* v. *Norton*, 90 N. J. Eq. 314 [107 Atl. 67]; 7 C. J. S. 1026.)

With such legal principles in mind, an examination of the record for the purpose of ascertaining in detail the existence of the particular facts upon which the judgment, from which the instant appeal has been taken, was founded, of necessity must be considered:

(a) It appears that on the evening of the day that preceded the date when the deposition of Mrs. Kinsler was to be taken, she went to Eversole's office, and in the course of a conversation then and there had between them she inquired of Eversole, "What do you think they will ask me?" As testified by Mrs. Kinsler, "He said, 'I don't know, might ask you anything; might ask you if you had corn flakes for breakfast, I can't tell you what they will ask you.' 'Well' I said, 'I meant I wanted to know what sort of answers', one can frequently get themselves terribly tangled up, and I wanted

to know what sort of answers and questions might be asked, and he said he didn't know, have to wait till the(y) asked me, and then I said 'Well there were a number of things I wanted clear in my mind' and I spoke about that, and he said, 'Oh anyone as smart as you, to ask questions like that, you know the answers, you know, Mrs. Kinsler you can take care of yourself, you are quite a talker, aren't you?' "

(b) On the taking of her deposition, when in response to a question as to whether she was married, and Mrs. Kinsler had answered in the affirmative, Eversole interposed the remark, "Oh, that's going to be my next case for Mrs. Kinsler, her divorce."

(c) At another conversation that occurred between the parties, as testified by Mrs. Kinsler, "I asked him if anything had been done, and I mentioned I had learned about Mr. Anker, (the defendant in the action), and his driving, thinking it might be relevant, and he said if I would go out and dig up all the dirt I could about Lou Anker 'and bring it in here, we will produce it in court, the judge may not allow it, but it will have its effect upon the jury'."

(d) The record discloses the further fact that the contingent fee contract contained a provision that Anna Kinsler and Maurice Kinsler "are to advance all outlays required in cash during the pendency of the litigation upon demand therefor; . . . " In that connection, shortly after her deposition had been taken, Mrs. Kinsler testified, "Mr. Eversole said we must have a jury trial, because he said 'you are better off with a jury, in any jury picked in Mendocino County, at least two men on that jury would know that Lew Anker drinks'. I also said I felt I couldn't stand the expense of a jury trial, I had no money, and I asked him the approximate cost of a jury and he told me, and when I learned it might run into several hundred dollars I said I had no money. And he said 'you make me sick, always crying like you didn't have an egg left in your basket'. I told him the ranch was mortgaged to the fullest extent and we couldn't do anything about that and he said 'Well, we can't do anything without a jury, and we will have to have it.' Q. State whether or not you specified it to be tried before the Court? A. I said I couldn't have a jury, if I had a case I was willing it should stand on its merits. . . . Q. And you stated you would have to have a trial by the judge? A. Yes. . . . Q.

And he told you at that time that he wouldn't take the case unless there was a jury trial? A. Yes. Mr. Phillips: Wouldn't continue to take the case. Mr. Brunner: I accept your amendment. Q. That he wouldn't continue with the case unless there was a jury trial? A. Yes.''

█ It will thus be observed that the substance of such asserted ''professional'' misconduct is:

(1) that Eversole declined to take seriously Mrs. Kinsler's inquiry as to what questions would be asked her on the taking of her deposition, but that at the same time he complimented her on her ability ''to take care of herself'';

(2) that in the presence of third persons he made a facetious remark with reference to a possible divorce suit that thereafter might be instituted between Mrs. Kinsler and her husband;

(3) that in response to information that voluntarily had been given by Mrs. Kinsler to Eversole regarding the defendant in the action, Eversole told her to ''go out and dig up all the dirt'' she could about the said defendant;

(4) that in accordance with the provision of the written agreement between the parties, Eversole insisted that Mrs. Kinsler produce sufficient cash to meet the expense of trying her case before a jury.

Incidents, such as those to which reference just has been had, are not uncommon to the practice of nearly every lawyer of extensive trial experience. Of course, it was but natural that Mrs. Kinsler should be interested in ascertaining, if possible, how she should demean herself at a time when her deposition was about to be taken; but for her to anticipate that her attorney would specifically inform her regarding ''what sort of answers'' she should give to questions that might be propounded to her, in itself constituted an insinuation that well might have been considered an imputation or suggestion regarding Eversole's possible lack of integrity or his lack of observance of ethical conduct. In such circumstances, his forbearance was commendable, and his response not inappropriate. On the occasion when Eversole made the unfortunate remark with reference to a possible divorce suit for Mrs. Kinsler, although perhaps embarrassing to her, it was evident that no offense was intended, but that to the contrary, as was testified by Eversole, it was meant merely as facetious; and probably was just his way of ''trying to be

funny''. It also is clear that the incident regarding the production by Mrs. Kinsler of sufficient money with which to pay the expense that necessarily would be incurred in a trial by jury, was of no great importance. It is common experience that attorneys and their clients frequently differ and even violently disagree between or among themselves with reference to the conduct or the procedure which should relate to the trial of the action. However, it is well established law that the attorney has complete charge and supervision of the procedure that is to be adopted and pursued in the trial of an action; and in accordance with that law, if Eversole wished to have a jury trial he had a right to insist that the trial be so conducted. In the case entitled *Price* v. *McComish*, 22 Cal. App. (2d) 92 [70 Pac. (2d) 978], the court said that, subject to the rule that an attorney in the conduct of a case may not impair the substantial rights of his client, nevertheless, '' . . . it is well established that, especially in what may be termed purely procedural matters . . . an attorney is fully authorized'' to bind his client. (See, also, 6 C. J., p. 643; *Deitz* v. *Bolch,* 209 N. C. 202 [183 S. E. 384]; 3 Cal. Jur., pp. 653, 654; *Armstrong* v. *Brown,* 12 Cal. App. (2d) 22 [54 Pac. (2d) 1118]; *Lally* v. *Kuster,* 177 Cal. 783 [171 Pac. 961]; *Boca etc. R. R. Co.* v. *Superior Court,* 150 Cal. 153 [88 Pac. 718]; *Anglo California Trust Co.* v. *Kelly,* 95 Cal. App. 390 [272 Pac. 1080]; *Electric Utilities Co.* v. *Smallpage,* 137 Cal. App. 640 [31 Pac. (2d) 412].) And again in the case entitled *Union Central Life Ins. Co.* v. *Anderson,* 291 Ill. App. 423 [10 N. E. (2d) 46, 52], the court said, ''When one puts his case in the hands of an attorney, it is a reasonable presumption that the authority conferred includes such actions as the attorney, in his superior knowledge of the law, may decide to be legal, proper, or necessary in the prosecution of the suit. . . . Attorneys may . . . of necessity make disposition of many things that arise in and about the trial of cases.'' Also, in the recent case entitled *Shores Co.* v. *Iowa Chemical Co.,* 222 Iowa, 347 [268 N. W. 581, 106 A. L. R. 198], wherein defendant's attorney waived a jury trial, allegedly without the knowledge or the consent of the defendant, and thereafter defendant's motion for a jury trial was overruled, the court set forth in a clear and complete manner a statement showing the extent of authority conferred upon an attorney in the conduct of an action, as

follows: "When one hires an attorney to represent him in litigation, that attorney has full charge of the case as far as procedure and remedy are concerned. He is trained and skilled in the law. A client has no knowledge of procedure and intrusts this to the attorney he employs. In 2 Ruling Case Law, section 63, page 986, we find the following: 'An attorney of record, by virtue of his employment as such, subject to the approval of the court, has implied authority to do all acts necessary and proper to the regular and orderly conduct of the case, and affecting the remedy only and not the cause of action, and such acts, in the absence of fraud, will be binding on the client, though done without consulting him, *and even against his wishes.*' (Italics added.) In 6 C. J., section 146, at page 641, it is said: 'The general implied authority of an attorney by virtue of his employment includes the doing on behalf of his client of all acts in or out of court necessary or incidental to the transaction or management of the suit, or to the accomplishment of the purpose for which he has been retained, and which affect only the remedy and not the cause of action. The choice of proceedings, the forum, the manner of trial, and all matters of procedure, and the like are within the sphere of his general authority, and as to these matters his client is bound by his action.' In 6. C. J., section 147, at page 643, it is said: 'The line of demarcation between the respective rights and powers of an attorney and his client is clearly defined. The cause of action, the claim or demands sued upon, and the subject matter of the litigation are all within the exclusive control of a client; and an attorney may not impair, compromise, settle, surrender or destroy them without his client's consent. But all the proceedings in court to enforce the remedy, to bring the claim, demand, cause of action or subject matter of the suit to hearing, trial, determination, judgment and execution are within the exclusive control of the attorney.' In the recent case of *State* v. *Froah*, reported in 220 Iowa, 840, at page 845 [263 N. W. 525, 528], this court said: 'The specifications of powers of an attorney contained in the Code do not exclude all other powers.' *Ohlquest* v. *Farwell & Co.*, 71 Iowa, 231 [32 N. W. 277, 279], speaking of the powers of an attorney, says: ' "But he is, by his general employment, authorized to do all acts necessary or incidental to the prosecution or defense which pertain to the remedy pursued. The

choice of proceedings, the manner of trial, and the like, are all within the sphere of his general authority, and, as to these matters, his client is bound by his action." *Rhutasel* v. *Rule*, 97 Iowa, 20 [65 N. W. 1013].' "

It follows that Mrs. Kinsler, having theretofore agreed to advance the necessary moneys for the expenses of the action, had no just right to complain of the fact that some time prior to the date when the action was to be tried Eversole had demanded performance of that condition, or that on her failure to do so he would retire as her counsel; but in that regard it is noteworthy that the question was left open and undetermined by the respective parties.

■ Apparently, the only really untoward incident that occurred during the course of the business relations that existed between the parties was that wherein Mrs. Kinsler asserted that Eversole suggested that Mrs. Kinsler "go out and dig up the dirt" about her legal opponent and that although such evidence properly might not be admissible on the trial of the action, nevertheless it would be "produced" and have an effect on the jury that would be unfavorable to the defendant. Unfortunately, it is a well-known fact that such conduct on the part of some attorneys is not infrequently observable in the trial of both civil and criminal actions. It is none the less unethical on that account. However, in that regard, as appears in the record herein, Eversole's testimony in that connection did not square with that which was given by Mrs. Kinsler. He testified as follows: "Q. Did you ever at any time tell Mrs. Kinsler to go out and dig up all the dirt she could about Anker? A. No 'digging up dirt' isn't an expression of mine. I did tell her it was very important in this case what I know of Mr. Anker and what she herself told me about previous acts of Mr. Anker, she could help by finding out all about Anker. I was under the impression he had been in numerous accidents before—under the impression that he had been driving in a drunken condition often and had been picked up for that, and what she might secure would help very greatly. I never told her to go out and 'dig up dirt', I don't use that expression, it's not one of my expressions, I wouldn't say 'dig up dirt', as far as I remember I told her to dig up all she could, that's what I told her to the best of my recollection. Q. Did she ever tell you that she thought that you should do that, that you were the at-

torney in the case? A. Not until here on the stand yesterday. On the contrary Mr. Brunner, she said she would. Q. Did she bring in to you after that, as a result,—withdraw that. Q. After that conversation did she bring in to you any information about Anker? A. I think not, I wouldn't be positive to that. She may have. At any rate, if she did, it was to a very small extent. Wouldn't impress itself upon my memory.''

In any event, from the fact that Eversole was discharged before the trial took place, it becomes evident that he did not actually produce inadmissible ''dirt'' for the purpose of improperly affecting the or any verdict that might be returned by the jury. At most, Eversole's ''unprofessional'' conduct (if any) consisted merely in the making of an unethical suggestion that never was acted upon in any way by either of the parties. On her own initiative, Mrs. Kinsler already had busied herself in ''digging up the dirt'', and even conceding that Eversole intimated that she continue along that line, it is unlikely that Mrs. Kinsler could have been greatly shocked by Eversole's conduct in that regard.

According to each of the asserted grievances upon which Mrs. Kinsler has relied the greatest weight to which in reason and good conscience it may be entitled, it amounts to nothing more than a triviality. Nor can all of them combined produce the effect of that substantiality in ''professional'' misconduct that is so properly demanded even for judicial censure. No one even approaches perfection either in his professional expression or in his official demeanor as an attorney and officer of the court. In truth, there is ''so much bad in the best of us'' that the faults of anyone should be rather glaring and clearly unethical before others may be justified even in indulging in serious adverse criticism thereof, much less, in adjudging drastic penalties as punishment therefor. In the instant case it results that the evidence upon which the judgment depended was insufficient to furnish legal support for the finding and conclusion of law that Eversole was discharged as an attorney for ''good and sufficient cause''.

The judgment is reversed. In addition thereto it is ordered that consistent with the views hereinbefore expressed, the cause be and it is remanded to the superior court for the sole purpose of determining, in accordance with the provisions of the contract between the parties, the amount of

money as attorney's fees in the original action, and the damages as attorney's fees in the instant action, if any, to which Eversole may be entitled and thereupon to pronounce its judgment in consonance therewith.

Langdon, J., Edmonds, J., Shenk, J., Curtis, J., and Waste, C. J., concurred.

A rehearing was denied on September 1, 1938, and the judgment was modified to read as above.