[L. A. No. 20251. In Bank. Feb. 2, 1948.]

## D. L. TAYLOR, Respondent, v. J. B. HILL COMPANY (a Corporation), Appellant.

Clyde E. Cate and Alfred E. Cate for Appellant.

Ogden, Crocker & Steelman and Samuel Steelman for Respondent.

CARTER, J.—Defendant appeals from a judgment awarding $1,421.50 damages to plaintiff for breach of contract.

By the terms of a contract dated June 6, 1943 (a written instrument drawn by defendant), which is the basis of the action, defendant agreed to sell and plaintiff to purchase a quantity of barley. The quantity, price, quality, grade, etc., are set forth as follows:

| Quantity | Commodity | Price | Unit | How Packed | Sample & Grade |
|---|---|---|---|---|---|
| 10-12000 | sacks Barley | 1.95 | CWT | sked | H 10 |

. . . Sack Count Indefinite acct. Remarks Now Harvesting May be More or Less.'' Defendant delivered 6,612 sacks, failing to meet the minimum requirement of 10,000 sacks, and for that breach the damages were awarded. It was stipulated that when the contract was negotiated a sample bag of barley marked ''H 10'' was delivered by defendant to plaintiff.

Defendant asserts that it was obligated to deliver only so much barley as was produced that season on the ranch of Pedro Erro and that such quantity was delivered. It urges that the symbol ''H 10'' mentioned in the contract referred to the barley it was to obtain from Erro and limited the quantity to be delivered to the amount produced by Erro on his ranch. It purchased barley from Erro to perform the contract. Plaintiff contends that there was no such contingency affecting the quantity delivered, and that the obligation was to deliver the minimum quantity of 10,000 sacks mentioned in the contract.

It is a settled rule that in case of uncertainty in a contract it is construed most strongly against the party who caused the uncertainty to exist—the party drafting the instrument. (Civ. Code, § 1654; *Estate of Rule,* 25 Cal.2d 1, 13 [152 P.2d 1003, 155 A.L.R. 1319]; *Pacific Lbr. Co.* v. *Industrial Acc. Com.,* 22 Cal.2d 410 [139 P.2d 892]; 6 Cal. Jur. 307-308.) Viewing the instant contract and circumstances in the light of that rule it may reasonably be inferred that the symbol ''H 10'' referred to a certain quality of barley as shown by a sample thereof and not to the source of the barley as limiting the quantity that was sold. The quantity of barley is expressly stated to be 10,000 to 12,000 sacks. The designation ''H 10'' rather than appearing under the column heading ''Quantity'' is found under the heading ''Sample & Grade,'' that is, the *quality* of the barley. A sample is ''A part of anything presented for inspection, or shown *as evidence of the quality of the whole.''* [Emphasis added.] (Webster's International Dictionary [2d ed.], p. 2210.) Likewise ''Grade'' deals with quality. It is a position in a scale of quality. This points cogently to the conclusion that the term ''H 10'' concerned quality and not quantity, or source of the barley. Moreover, a sample —specimen of barley labelled ''H 10'' was exhibited to plaintiff advising him of the quality of the barley he was buying. The ''H 10'' referred to in the contract must, therefore, be the sample exhibited to the buyer to show the quality

of the barley. The only reference in the contract which may imply a certain source or amount of grain to be delivered (other than the 10,000 to 12,000 sacks) is the statement that "Sack Count Indefinite acct. Remarks Now Harvesting May be More or Less." It is reasonable to infer that the "Sack Count" refers to the 10,000 to 12,000 sacks theretofore mentioned, and as stated, that count was "indefinite" to the extent of 2,000 sacks. It may be that the statement merely explained why the quantity was not fixed at a certain figure without variation, that is, the harvesting was the reason for the variation. It is also reasonable to conclude that the barley was not to be limited to any particular source, and by such limitation, the quantity restricted to the productive capacity of that source. If there is doubt whether the last quoted clause (assuming it limits the quantity to a defined source), or the figures under the word "Quantity" controls the quantity, then the latter may prevail under the rule of construction heretofore announced.

The following testimony of a witness familiar with grain transactions and contracts supports the foregoing interpretation: "Q. . . . Referring to the last word on that line, 'H-10,' does that 'H-10' have any significance in the trade? . . . A. 'H-10' in that case would represent *the seller's sample* or designation number of that particular lot of barley. Q. By Mr. STEELMAN: As a matter of trade significance does it indicate the source of the barley? A. That is merely a designating sample. The *barley would have to equal that lot of barley. It could be shipped from any part of the United States, or a foreign country, as long as it equaled that particular sample.*" In regard to the meaning of "Sack Count Indefinite" that witness testified on cross-examination: "Well, the contract says 10,000 to 12,000 sacks, sack count indefinite. Inasmuch as they didn't know the exact sack count I would say it would be a minimum of 10,000 and a maximum of 12,000 sacks." And in speaking of the difference between buying a fixed amount and being limited by the particular amount raised on a certain ranch, he further testified: "Q. Let us take it from this standpoint, Mr. Devendorf. In the event that the farmer that you bought from was just starting in to harvest the crop and he made an estimate that there will be so many sacks from this particular lot of land, and it falls short of his estimation, would you expect to receive any more than he actu-

ally produced from the land if you bought that lot? A. It is according to how your contract reads. If you buy the crop produced from the land located so and so, and give a description of the land, if it had a crop failure and there is nothing produced you wouldn't get anything. Q. Then, if I understand you correctly, if you buy John Jones' crop of grain and it hasn't been harvested and it falls short of what his estimate was, you could only expect to get that which he actually received? A. *If you was specifically out buying that particular crop; but if he came in with a sample and he sold you a thousand sacks of a certain sample, that would be a different proposition.* Q. I think we are getting to understand each other. If you bought a specific lot of grain from a specific ranch you would only feel yourself entitled to receive the grain that was produced on that ranch, is that correct? A. You would buy it subject to crop production in that case and you would only get what was produced on that land. Q. *In the other case, if you sold by sample you would be entitled to receive the amount of barley that they· had agreed to sell you on the contract.* A. Yes. Q. Of like quality. A. Yes. Q. I think I understand you. A. If a farmer could sell you a thousand ton of barley, or I could sell you a thousand ton of barley, and if I didn't raise it I could go down the road and buy it from somebody and give it to you. I am selling it to you on a sample. Q. Then there is a distinction between buying on a sample and buying a specific lot? A. Buying subject to crop production. THE COURT: Is that the trade term that is used when you are purchasing only the product of a specific ranch? THE WITNESS: If you're buying from a ranch, why, you would buy subject to crop production. If he produces it, O. K. If he doesn't produce it, why that is also O. K. THE COURT: Is that the term that is customarily used when that is the proposal? THE WITNESS: Subject to crop production, yes. . . . Q. What I was trying to find out, Mr. Devendorf, is this. Those words, 'Subject to crop production' are not words that would have to go into that contract that you bought a specific crop from some one? A. To protect yourself you would put it in there. Q. Or language to indicate that? A. Something to that effect, yes.'' Hill, an officer of defendant, testified on cross-examination: ''Q. Isn't it a fact that the barley that was contained in this sample H-10 could be duplicated all over the world? A. I don't think it is fact, no, sir.

Q. Isn't it a fact that *barley sells largely according to its weight and grade and not according to its source?* A. *That is right.* Q. And that when a dealer in grain buys *barley he buys it according to those facts and not according to what source it comes from?* A. Well, owing to what class of barley it is. *In this particular case, why, you are perhaps correct,* but in other instances you wouldn't be correct. . . . Q. And any experienced grain dealer could, by looking at your grain, determine that that was 38-pound grain and that a certain ten-cent differential would have to be allowed, couldn't he? A. He couldn't tell exactly what it would weigh until he had weighed it, but he could estimate. Q. And having determined that weight he could then determine the price in relation to the standard price that you have mentioned? A. That is right. Q. And 38-pound barley was obtainable all over the world at that particular time, isn't that right? A. I think you are stretching it out, 'all over the world,' a little bit. Q. I will admit that, because there was a war going on. A. You are covering a lot of territory. Q. But at any rate that you could obtain it in various parts of the United States? A. I presume you could."

Opposed to the foregoing is the testimony of a Mr. Peters, a grain broker, to the effect that he and plaintiff agreed to purchase the barley from defendant as a joint venture or partnership; that he had conversations with Hill (an officer of defendant) indicating the "H-10" referred to a particular lot of barley, namely that grown by Erro on his ranch and that the quantity being sold was governed by the amount harvested from that ranch; that he advised plaintiff of the contingent nature of the amount. Peters' testimony with reference to the joint venture could have been disbelieved by the trier of fact. He stated that the venture was later abandoned. The reason therefor does not appear. Whether "later" meant before or after his conversation with Hill does not appear. He supplied no money in the transaction, thus indicating that there may have been no such arrangement. He told defendant, plaintiff was buying the grain and the contract ran to plaintiff. Plaintiff testified that he purchased the grain from defendant through Peters. There is evidence which indicates Peters was endeavoring to find a purchaser for defendant and he broached the subject to plaintiff. This evidence points to Peters as Hill's agent, refuting the contention of a joint venture between plaintiff and Peters.

Certainly the trial court was not bound by the testimony of Peters and Hill as against the inferences which were deducible from the other facts in the case contrary thereto. Thus we have nothing more than a conflict in the evidence and the court could have concluded that Peters was not plaintiff's agent, partner, or coadventurer. Plaintiff testified (contrary to Peters' testimony) that Peters did not inform him that defendant was selling only a particular lot of grain. Thus the conversation between Hill and Peters could have no bearing upon the construction of the contract.

There is other evidence by Hill and others, but over all we find nothing more than a conflict in the evidence. Under such circumstances the conclusion of the trial court will not be disturbed. (See *Estate of Wunderle,* 30 Cal.2d 274 [181 P.2d 874]; *Estate of Rule,* 25 Cal.2d 1 [152 P.2d 1003, 155 A.L.R. 1319].)

For the foregoing reasons the judgment is affirmed.

Gibson, C. J., Shenk, J., Edmonds, J., Traynor, J., and Schauer, J., concurred.