Filed 1/13/16  Pitto v. Lind CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(San Joaquin)

----

| | |
|---|---|
| ALAN PITTO, | C070540 |
| Plaintiff and Respondent, | (Super. Ct. No. 39200800195286CUBCSTK) |
| v. | |
| DAVID LIND, | |
| Defendant and Appellant. | |

Defendant David Lind filed a motion for new trial under Code of Civil Procedure section 657 claiming his attorney's jury trial waiver was unauthorized and that the damages awarded against him in this litigation were excessive.  (Unless otherwise set forth, statutory references that follow are to the Code of Civil Procedure.)  The underlying dispute involved Lind's refusal to sell plaintiff Alan Pitto wine grapes in 2008 and 2009 under a document executed by the parties, which the court found was an enforceable contract.  The denial of Lind's new trial motion is at issue on appeal.

We note at the outset that respondent's brief does not contain a single citation to the record.  The brief is largely unhelpful and violates several well established rules of court.  (See Cal. Rules of Court, rules 8.204 & 8.360.)

1

Lind contends the trial court erred in denying the motion because his attorney waived a jury trial without his consent, and that he is not liable for damages for failing to sell Pitto grapes grown on land he neither owned nor leased in 2008 and 2009 under the terms of the contract. We conclude that even if the jury trial waiver was unauthorized, defendant acquiesced in a court trial thereby ratifying the waiver. We agree, however, that under the plain language of the contract, defendant was only required to sell Pitto merlot grapes from specific acreages he either owned or leased in San Joaquin County in 2008 and 2009. Because the undisputed evidence shows he did not own or lease certain acreages of the fields in question for those years, any damages awarded for the merlot crops in 2008 and 2009 were excessive. We modify the judgment accordingly. As so modified, we affirm the judgment.

FACTS AND PROCEEDINGS

A.     The Parties and their Agreements

In 2007, Lind owned or leased land in San Joaquin County on which he grew several varieties of wine grapes. Pitto purchased wine grapes to sell to wineries and he sometimes harvested the grapes he purchased.

On September 26, 2007, the parties executed a form contract, supplied by Pitto, containing handwritten provisions to purchase an estimated 300 tons of cabernet sauvignon grapes grown on 40 acres of land either owned or leased by Lind. Two days later, Pitto harvested the grapes and paid Lind in full according to the terms of their agreement.

On September 30, 2007, Lind and Pitto executed a second grape purchase agreement, which is the subject of the present appeal. Like the September 26 contract, it is a form contract supplied by Pitto that also includes various handwritten provisions.

The years 2008 and 2009 are handwritten at the top of the agreement. The agreement states, in relevant part, that subject to certain quality, inspection, and delivery

2

conditions, Pitto purchased "all the crops of grapes of the variety specified during the calendar year 2007 only, on the land, leased or owned by Seller, located as follows: San Joaquin County, California District 11." Although no precise address for the land is identified, the court found the parties knew the specific acreages to which the contract applied.

The agreement includes, among other things, typed headings for the following: "variety," "acres," "estimated tons" and "price per ton." Handwritten information below these typed headings refers to several varieties of grapes, various acreages, estimated tonnages, prices and years. The agreement lists 25 acres of merlot grapes estimated at about 250-300 tons for $140 per ton. No date is listed next to this entry. Next, the agreement lists 250 estimated tons of chardonnay grapes on 40 acres for $400 per ton for 2008 and 2009. The agreement then lists 250 estimated tons of cabernet sauvignon grapes on 40 acres for $250 per ton for 2008 and 2009. Finally, it lists 250 estimated tons of merlot grapes on 25 acres for $250 for 2008 and 2009. An arrow linking both merlot references is handwritten on the side of those entries.

The contract also contains a "warranty of exclusive delivery" provision that prohibits Lind from delivering Pitto grapes grown on other lands. The express warranty provides, "Seller shall not deliver any grapes grown on any acreage other than that described herein. Any breach by Seller of the provisions of this paragraph shall relieve Buyer of any obligation to accept any further deliveries and Seller shall be liable for any and all damages caused by any such breach."

Lind did in fact sell Pitto the cabernet sauvignon and merlot grapes in 2007, and Pitto paid in full for those grapes. But he refused to sell Pitto any grapes in 2008 and 2009. Following Lind's refusal to sell, Pitto sued Lind for failing to perform under the September 30 contract.

B.    The Bifurcated Trial Proceedings

In October 2008, Pitto filed a verified complaint against Lind alleging causes of action for breach of contract, anticipatory breach, breach of the implied covenant of good faith and fair dealing, unjust enrichment, fraud, and negligent misrepresentation. Lind failed to timely respond, and Pitto took his default. Lind eventually hired counsel, Michael F. Babitzke, and the parties stipulated to set aside the default. Lind answered the complaint, admitting he entered into an agreement for the 2007 crop year, but denying that there was any agreement for the 2008 and 2009 grape seasons.

Both Lind and Pitto requested a jury trial. Although Pitto deposited jury fees and submitted proposed jury instructions, it does not appear from the record that Lind ever did the same.

In January 2010, Babitzke moved to withdraw as Lind's counsel, and the court granted the motion. Eight months later, Babitzke returned to the litigation on Lind's behalf.

The matter was originally scheduled for trial on November 1, 2010, but could not be tried within the court's time available on that date. The jury trial was therefore continued to February 14, 2011. A minute order dated February 14 states, "[t]he parties stipulate to the following: trial will be bifurcated and will begin with the contract issue. All parties waive trial by jury for the first part of the trial." Lind was not present in court on February 14.

A court trial on liability commenced the next day without a court reporter. The parties later prepared a partial settled statement concerning the proceedings. (Cal. Rules of Court, rule 8.137, subd. (b)(1).)

Lind was present and did not object to the matter being tried without a jury. According to the settled statement, the parties disputed whether the September 30 contract required Lind to sell Pitto grapes in 2007 only, as he claimed, or also in 2008

4

and 2009 as Pitto contended. The parties focused largely on whether there was a valid contract for 2008 and 2009, and not specifically on performance or obligation issues under the contract if the court eventually found a binding agreement for those years.

Lind testified he agreed to sell Pitto cabernet sauvignon grapes and merlot grapes in 2007 only. He testified that the merlot grapes were grown on the property of his neighbor, Bob Bowen.

Lind said the handwritten portion of the September 30 agreement listing additional acreages and grape varieties in years 2008 and 2009 was no more than a proposal by Pitto to buy the grapes from Lind in the future. Pitto wrote the "proposed" terms on the September 30 agreement only for convenience because the parties did not have another piece of paper available when they discussed the proposal. Although dated with two different dates, Lind claimed they signed both documents on the same day.

Lind was unhappy after Pitto harvested the grapes in 2007 because he thought Pitto damaged his vineyards and left a portion of the cabernet crop unharvested. Following the harvest, Lind decided he would not sell to Pitto in the future, and told him so several times.

On cross examination, Pitto's counsel asked whether the real reason they had ended up in court was not because of any actual contract dispute, but because Lind was angry with Pitto for taking over Bowen's merlot field in 2008, which Lind had previously farmed for many years. Pitto's counsel then asked whether Lind would like to know the tonnage Pitto was able to harvest from the Bowens' property "now that it is actually farmed properly?" Lind responded he would if it was more than 420 tons. Lind's attorney objected, and the court sustained the objection.

Pitto admitted he did not harvest approximately 2 acres of cabernet grapes, but said Lind's vineyard had too much dead wood in it and that the harvester could not reach the area. Pitto also testified that Lind agreed to sell him merlot grapes in 2007, 2008, and 2009, and chardonnay and cabernet sauvignon grapes in 2008 and 2009. Relying on the

5

September 30 agreement, Pitto entered into a contract to sell the grapes to a winery. Because Lind refused to sell him the grapes in 2008 and 2009, Pitto had to buy replacement grapes at a higher price and with commissions.

The court tentatively ruled that the September 30 agreement was a binding contract to purchase grapes in 2007, 2008, and 2009, but allowed the parties to file supplemental briefs on the issue. Lind's supplemental trial brief generally raised the same arguments against finding an enforceable agreement. The first page of the trial brief notes that the issue of damages could be submitted to a jury. At a hearing on the supplemental briefing and before the court rendered its decision of whether a valid contract existed for 2008 and 2009, both Lind and Pitto were again sworn as witnesses and testified further in response to several questions posed by the court and counsel. Lind specifically testified that they performed the disputed agreement with respect to the merlot grapes in 2007, which belonged to his neighbor Mr. Bowen. No evidence was presented showing the merlot grapes referenced in the agreement came from property other than that owned by Mr. Bowen. Following testimony from the parties and argument on the supplemental briefing, the court confirmed its tentative decision.

Before the hearing concluded, the court asked whether the parties wanted a jury trial for the damages phase. Although Pitto's counsel thought it unnecessary, Mr. Babitzke said he wanted to see the court's written statement of decision on liability before he decided whether to have the court or a jury try the damages phase. Lind was present in the courtroom.

The court issued a written statement of decision finding that the September 30 agreement was an enforceable contract covering 2007 through 2009. The court specifically found that "on September 30, 2007, [Pitto] and [Lind] entered into a written agreement, the terms of which were clear enough so that each could understand what they were required to do; that each party agreed to the terms of the contract and that under the circumstances it is reasonable to conclude that each party understood that there was an

6

agreement for the purchase/sale of the specifically described varieties of grapes during certain specified years." The court also concluded that handwritten contract terms "clearly and unambiguously reflect[ed] an agreement for the sale of specific varieties of grapes, from specific acreage, in specific quantities, for specific prices and relating to specific years."

A court trial on damages was set for July and later moved to October. It does not appear from the record that either party requested a jury trial for the damages phase. Before trial, Lind's attorney substituted out of the case, leaving him to represent himself.

Appearing in pro per, Lind argued at the damages phase that even if the contract was binding, he was not liable for damages for the merlot grapes in 2008 and 2009 because they were grown on his neighbor's property. He did not call a damages expert.

Pitto testified that he relied on the September 30 agreement to enter into a multi-year agreement to resell the grapes to a third party, and that he had to buy more expensive replacement grapes when Lind refused to perform in 2008 and 2009. He admitted he purchased merlot grapes from Bowen and Lind. Pitto also called a forensic accounting expert who testified to three methodologies for calculating damages, including damages based on contract pricing, actual pricing received for replacement grapes from the third party, and the actual excess cost Pitto incurred in purchasing replacement grapes.

In a written statement of decision, and based on the testimony of Pitto's expert, the court awarded Pitto $133,981.03 in damages, which included 10 percent prejudgment interest. For the merlot grapes, damages were calculated as follows: $24,124.57 for the 2008 merlot crop, plus 10 percent interest from December 31, 2008 until a date of trial on July 20, 2011 ($6,245.58), and $34,597.91 for the 2009 merlot crop, plus 10 percent interest from December 31, 2009 until a trial date on July 20, 2011 ($5,449.17). Judgment was entered accordingly.

7

C.    Lind's New Trial Motion

After hiring new counsel, Lind timely moved for a new trial on multiple grounds under section 657, including irregularity of proceedings, surprise, and excessive damages. He submitted a declaration in support of the motion.

Lind declared he was unhappy with his counsel's representation. He always contemplated having a jury trial, and he would not have agreed to a jury trial waiver. He was only told about the stipulation to waive the jury trial when he walked through the courtroom doors on the first day of trial, and he believed the waiver applied to both phases of trial. He never objected because he was surprised by the waiver. No one ever told him he could request a jury trial for the damages phase of trial, and he never saw any documents, such as notices of court trial, that included information regarding paying jury fees for a jury trial.

He also declared that in 2008 and 2009 he did not own or lease the land on which the merlot grapes were grown. He had the right to farm the land until 2007. As of 2008, however, Pitto leased the land from Lind's neighbor, Mr. Bowen, and acquired the rights to sell the merlot grapes.

Pitto opposed the motion but did not file any counter declarations disputing Lind's factual contentions. According to Pitto's opposition, the motion for new trial did not present any new or additional evidence or information that the court had not already heard and considered during the bifurcated trial.

At the hearing on the motion for new trial, Lind's counsel first argued that damages were excessive because Lind did not have the rights to the merlot grapes in 2008 and 2009. Pitto's counsel objected that the argument assumed facts not in evidence and was irrelevant to the motion. The court, however, overruled the objection for purposes of the motion.

8

For the remainder of the hearing, Pitto's counsel focused solely on the argument that Lind failed to request a jury. Pitto did not address the issue of whether Lind actually owned or leased the merlot acreage in 2008 and 2009.

After the parties submitted the matter, the court commented that Lind's counsel was experienced and that Lind appeared to assent to the jury trial waiver as the court did not observe any disagreement between Lind and his counsel regarding the lack of a jury. Defendant never objected or raised the jury issue during any portions of the trial. In response to Lind's argument that damages were excessive because he did not own or lease the land where the merlot grapes were grown, the court stated only that "[t]he issue of the grapes was discussed at length during the trial." The court denied the motion in its entirety.

DISCUSSION

I

*The New Trial Motion*

A.    Standard of Review

Section 657 governs motions for new trials. Among other grounds, a new trial may be granted for irregularity in the proceedings of the court, excessive damages, insufficient evidence to justify the verdict or other decision, or for an error in law, which occurred at the trial and to which the party making the new trial motion objected. (§ 657, subds. (1), (5), (6), and (7).)

"[A] trial judge is accorded a wide discretion in ruling on a motion for new trial . . . ." (*Los Angeles v. Decker* (1977) 18 Cal.3d 860, 871.) The exercise of such discretion is "given great deference on appeal." (*Id.* at pp. 871-872.) Despite a trial court's wide latitude in this regard, appellate courts have a duty "to review all rulings and proceedings involving the merits or affecting the judgment as substantially affecting the

9

rights of a party [], including an order denying a new trial." (*Id.* at p. 872, internal citations omitted.) When reviewing such an order, "we must fulfill our obligation of reviewing the entire record, including the evidence, so as to make an independent determination as to whether the error was prejudicial." (*Ibid.*)

B.    Jury Trial Waiver

Defendant contends the court should have granted him a new trial because his attorney waived a jury for the liability phase of the trial without his consent. This, he claims, rendered the proceedings irregular within the meaning of section 657. His failure to object, he argues, cannot be deemed acquiescence in his attorney's unauthorized waiver because he was taken by surprise and had little time to object.

In civil cases, it is well settled that a party's attorney has general authority to control the procedural aspects of the litigation and to bind the client in these matters. (*Zurich General Acci. & Liability Ins. Co. v. Kinsler* (1938) 12 Cal.2d 98, 105-107 (*Zurich*) [counsel could insist on jury trial over client's objections], overruled on other grounds by *Fracasse v. Brent* (1972) 6 Cal.3d 784, 792; see also *Cadle Co. v. World Wide Hospitality Furniture, Inc.* (2006) 144 Cal.App.4th 504, 510 (*Cadle*) [jury trial waiver effective where entered by counsel and not client].) The Supreme Court has recognized that such procedural matters include the decision to waive a jury trial. (*Zurich* at pp. 105-106; but see *Blanton v. Womancare, Inc.* (1985) 38 Cal.3d 396, 410-411, con. opn. of Bird, J. ["Whatever formulation is used to determine when an attorney has the authority to make decisions on the client's behalf, the decision to waive the fundamental right to a jury trial should rest with the client"].)

*Zurich* cited with approval several civil cases where counsel either waived a jury trial without the knowledge or consent of the client, or did so against the client's wishes. (*Zurich, supra,* 12 Cal.3d at pp. 105-106.) In doing so, it acknowledged the following: "The line of demarcation between the respective rights and powers of an attorney and his

10

client is clearly defined.  The cause of action, the claim or demands sued upon, and the subject matter of the litigation are all within the exclusive control of a client; and an attorney may not impair, compromise, settle, surrender or destroy them without his client's consent.  But all the proceedings in court to enforce the remedy, to bring the claim, demand, cause of action or subject matter of the suit to hearing, trial, determination, judgment and execution are within the exclusive control of the attorney." (*Id*. at p. 106, citing 6 C.J., § 147 at p. 63.)

*Cadle* similarly rejected the argument that a jury trial waiver was ineffective because it was made by an attorney rather than his client.  (*Cadle, supra,* 144 Cal.App.4th at p. 510.)  The court noted the basic principle that counsel is authorized to exercise his independent judgment concerning strategic litigation decisions such as whether to have a court or jury trial.  (*Ibid.*)

Defendant's counsel thus could waive a jury on his behalf without him being present.  Simply because he later claimed that he did not know about the waiver or disagreed with it does not mean the proceedings were irregular for purposes of granting a new trial motion.  Even if we assume for sake of argument that his counsel lacked the authority to waive a jury trial absent his presence or consent, however, we nevertheless conclude defendant ratified his attorney's unauthorized waiver by his conduct during both phases of the trial.

An unauthorized jury trial waiver may be ratified by words or conduct.  (*Escamilla v. California Ins. Guarantee Assn.* (1983) 150 Cal.App.3d 53, 58 (*Escamilla*).)  "If a client disagrees with his attorney's decision, he is obligated to repudiate the decision or alert the court."  (*Cadle, supra,* 144 Cal.App.4th at pp. 510, 511 [party cannot "sit by in silence, take his chances on a favorable judgment and then, after an adverse judgment, complain on appeal"].)

Here, defendant did neither.  Defendant concedes he never objected to the waiver during either phase of the trial.  At no time after his counsel told him a jury trial had been

11

waived did defendant ever alert the court that he disagreed with his attorney's waiver or otherwise tell the court that he wanted a jury. Instead, he sat through both phases of the bifurcated trial and never once raised the issue.

Defendant's claim that he mistakenly believed the jury trial waiver applied to both phases of the trial, rather than just the liability phase, is also belied by the record. Defendant's own supplemental trial brief, submitted after the court's tentative decision that the parties had a binding contract but before the damages phase, states: "The Court will recall that the parties stipulated to bifurcate the matter so that the issue of contractual liability would be determined by the Court and if appropriate the issue of damages could still be submitted to a jury or resolved in some other manner such as mediation or perhaps further trial." Although defendant's declaration supporting his new trial motion denies he saw other documents stating his right to a jury trial for the damages phase, he never claims he did not see his supplemental trial brief.

Defendant was also present at the supplemental briefing hearing before the court finally ruled on the contract liability issue. At the end of the hearing, the court specifically asked whether the parties wanted a jury trial for the damages phase. Defendant could have interjected that he did in fact want a jury. He did not.

While it is true that under some circumstances a party may seek relief from an unauthorized jury waiver by filing a new trial motion like defendant did here (*Cadle, supra,* 144 Cal.App.4th at p. 510 [noting appellant's failure to file a new trial motion as one of several bases for rejecting an unauthorized jury waiver argument raised for the first time on appeal]), filing such a motion after a court trial has been completed without any objection in no way guarantees relief from the waiver. (See *Escamilla*, *supra*, 150 Cal.App.3d at p. 58.) In *Escamilla*, for example, the appellants had paid jury fees and the case was designated as a jury trial for breach of contract. (*Id.* at p. 56.) The case was assigned to a judge who tried the matter, without any objection from either appellants or their counsel, and rendered a judgment against the appellants. (*Id.* at pp. 56,

12

60, fn.3.) Several weeks later, appellants moved for a new trial, claiming for the first time that they were entitled to a jury trial. (*Id.* at pp. 59-60.)

In denying the new trial motion, the court said: "At no time did you ever say you wanted a jury trial. Your clients were sitting there in the courtroom. At no time did they say they wanted a jury trial . . . and it just was a shock to me to read your Motion for a New Trial on the ground that after a two-day trial when there wasn't one word said about having a jury trial to come in and say we wanted a jury trial." (*Id.* at pp. 60, fn.3, 58 [record supported trial court's finding that appellants waived their right to a jury trial].)

*Tyler v. Norton* (1973) 34 Cal.App.3d 717 (*Tyler*), is similar. There, counsel filed a timely motion for a jury trial, which was deferred for ruling until the day of trial. (*Id.* at pp. 721-722.) On that date, the case was listed as a nonjury trial, so counsel assumed the court had denied his motion. (*Ibid.*) Counsel tried the case before the court without objection. (*Id.* at p. 722.) He later raised the jury trial issue as a ground for a new trial motion, which the court denied. (*Ibid.*) In affirming, the appellate court held that nothing prevented counsel from renewing his motion at trial. The court emphasized that a party "cannot play 'Heads I win, Tails you lose' with the trial court. After proceeding, without objection, to try their case for two days before a judge, they may not, after losing, raise the procedural issue." (*Ibid.*)

We find the reasoning in *Escamilla* and *Tyler* compelling. We thus conclude the trial court did not err in denying Lind's new trial motion where he did not object during trial and only raised the jury trial issue for the first time in his new trial motion. He could not sit by silently without ever informing the court or the opposing party that he wanted a jury trial.

13

## II

### *Excessive Damages*

Defendant also contends the court erred in denying his new trial motion based on excessive damages since, under the contract's plain language, he was only required to sell Pitto grapes grown on land he either owned or leased. In 2008 and 2009, he did not own or lease the land on which the merlot grapes were grown, and, therefore, he could not be liable for the failure to sell those specific grapes to Pitto. Thus, any damages awarded for the merlot grapes were excessive. We agree.

We note that respondent has not met this specific argument in his respondent's brief arguing only that the trial court properly found *liability* against Lind on the contracts.

It is undisputed that Lind did not deliver Pitto any merlot grapes in 2008 and 2009, and that the court awarded Pitto damages for that failure based on the September 30 contract. To properly evaluate whether those damages were excessive, we must first determine what the September 30 contract requires. To do so, we must interpret the meaning of the parties' contract.

Contract interpretation generally presents a question of law on appeal, which this court determines independently. (*Parsons v. Bristol Development Co.* (1965) 62 Cal.2d 861, 865 [contract interpretation is a judicial function]; *In re Tobacco Cases I* (2010) 186 Cal.App.4th 42, 47.) We interpret the contract to give effect to the mutual, expressed intention of the parties. (*In re Tobacco Cases I, supra,* 186 Cal.App.4th at p. 47.) "Where the parties have reduced their agreement to writing, their mutual intention is to be determined, whenever possible, from the language of the writing alone." (*Ibid.*)

The September 30 contract provides that Pitto purchased "all the crop of grapes of the variety specified . . . on the land, *leased or owned by Seller*, located as follows: San Joaquin County, California, District 11." (Italics added.) The contract then lists specific

14

acreage amounts, including 25 acres of merlot grapes. It also states that Lind "shall not deliver any grapes grown on any acreage other than that described herein."

We must essentially decide whether the above language demonstrates that the parties intended the purchase contract to be one for a certain tonnage of merlot grapes with no limitation as to the source of those grapes, or, alternatively, whether the parties intended the contract to be one to buy an estimated tonnage of grapes produced from a specific vineyard, namely, a 25-acre vineyard owned or leased by Lind. In resolving this issue, we find the Supreme Court's decision in *Taylor v. J.B. Hill Co.* (1948) 31 Cal.2d 373 (*Taylor*) instructive.

There, the Supreme Court considered a contract to purchase barley which listed a quantity range of 10,000-12,000 barley sacks and a price, as well as a sample and grade of "H10." (*Taylor, supra,* 31 Cal.2d at p. 374.) The contract did not identify any specific field or acreages. (*Ibid.*) The court awarded the plaintiff damages when the defendant failed to deliver the minimum requirement of 10,000 sacks of barley. (*Ibid.*) On appeal, the defendant argued he was obligated to deliver only so much barley as was produced that season from a specific ranch, claiming the "H10" listed under the "sample & grade" column referred to that ranch. (*Ibid.*) The court rejected the argument, however, finding instead that the contract was for the purchase of a set quantity of barley of a specific quality, and not one for the purchase of only that much barley produced from a specific field. (*Id.* at pp. 374-375.) It found the H10 referred to barley quality and not the location where the barley was grown. (*Id.* at p. 375.)

In contrast to *Taylor*, the contract in this case actually lists specific acreages and includes the location limitation that Pitto was purchasing merlot grapes on land owned or leased by Lind in San Joaquin County. From this language, it is reasonable to infer that, unlike the parties in *Taylor*, the parties here intended their contract to cover merlot grapes from a specific source rather than merely for a quantity of grapes from an unknown

15

source.  The express limitation in the contract prohibiting Lind from supplying grapes from any other acreage further buttresses our interpretation.

While Pitto testified during the damages phase that he bought tonnages and not acres, Lind's testimony appears to contradict this claim.  Lind argued that he should only be liable for the actual tonnages that were produced from the specific fields and not the tonnage estimates listed in the contract because "industry custom is that tonnages in a contract of this sort are estimated, and actual payment is for actual tons delivered."  In essence, Lind was arguing that the contract was only for the production from specific acres not one simply for tonnages that could be supplied from anywhere as Pitto contended.  The contract's plain language, discussed above, supports Lind's contention.

Even assuming the language is unclear, however, it is well settled that we construe any ambiguity against the drafter.  (*Taylor, supra,* 31 Cal.2d at p. 374 ["It is a settled rule that in case of uncertainty in a contract it is construed most strongly against the party who caused the uncertainty to exist-the party drafting the instrument"].)  Here, Pitto supplied the form contract, which included the language "on the land, leased or owned by Seller" as well as the express warranty that "Seller shall not deliver any grapes grown on any acreage other than that described herein."  Thus, even if Pitto later claimed he was merely buying tonnages of merlot grapes rather than grapes from specific fields owned or leased by Lind, that is not what the express language provides, nor what Lind understood. (*Frankel v. Board of Dental Examiners* (1996) 46 Cal.App.4th 534, 544 ["where the language of the contract is ambiguous, it is the duty of the court to resolve the ambiguity by taking into account all the facts, circumstances and conditions surrounding the execution of the contract"].)

During oral argument, Pitto's appellate counsel, who also represented him during trial, conceded that assuming the contract provided that Lind was only required to sell merlot grapes from specifically identified land he either owned or leased in 2008 and 2009--and Lind did not in fact own or lease that land during those years--then he had no

16

obligation to sell the grapes to Pitto under the plain language of the contract. Awarding Pitto damages for the merlot crop under that scenario would clearly be excessive. Pitto's counsel claimed, however, that he never conceded Lind did not own or lease the specified merlot acreage in 2008 and 2009. He further argued that no evidence was presented during trial showing Lind did not own or lease the property, and that we cannot consider Lind's declaration in support of his new trial motion that declares under penalty of perjury that he did not in fact own or lease the property at that time because Pitto himself controlled the Bowen merlot acreage.

We find counsel's claim that he never conceded Lind did not own or lease the merlot acreage somewhat disingenuous. The record shows that during the liability phase of trial counsel asked Lind whether the real reason they had ended up in court was not because of any actual contract dispute, but because Lind was angry with Pitto for taking over Bowen's merlot field in 2008, which Lind had previously farmed for many years. The question implicitly presumes that Pitto and *not* Lind controlled the Bowen merlot acreage during the relevant time period.

We also note that unlike his contention at oral argument--that Lind's declaration contained new evidence presented for the first time on the new trial motion--Pitto's opposition to the motion for new trial characterized the evidence as already having been presented and rejected by the court: "[There was] ample evidence to show that the arguments Defendant [Lind] now sets out regarding the excessive damages grounds were already heard and ruled on by the Court. *Defendant basically seeks a second shot at the exact same argument and evidence that has already been presented*." (Italics added.)

The trial court's comments during the hearing on the motion for new trial arguably support Pitto's claim below that Lind was merely rehashing previously presented arguments and evidence. In ruling on the motion, the court stated that "[t]he issue of the grapes was discussed at length during the trial." It is noteworthy that the court did not state that Lind was presenting the evidence for the first time.

In any event, we disagree that we cannot consider Lind's declaration to resolve this appeal. One of Lind's primary appellate contentions is that the court awarded excessive damages for the merlot crop and erred in refusing to grant his new trial motion on that basis. Lind's declaration is relevant to that issue.

Furthermore, the trial court overruled Pitto's oral objection to the evidence in Lind's declaration, and Pitto filed no declarations countering or otherwise disputing the facts as attested to by Lind. Since Lind timely filed the declaration below, the trial court considered the evidence, and the declaration is part of the appellate record, we may consider it in reaching our decision. (See *Kim v. Konad USA Distribution, Inc.* (2014) 226 Cal.App.4th 1336, 1346-1347 [appellate court rejected defendant's implicit argument that it was obligated to limit its review to evidence admitted at trial, thereby ignoring the fact that the plaintiff really did exhaust her administrative remedies under FEHA, as shown by evidence presented in postjudgment motion on statement of decision].) The undisputed evidence in the record, then, shows Lind did not own or lease the 25 acres of merlot grapes from Bowen in 2008 or 2009.

The record further shows that, although perhaps inartfully articulated, Lind did raise the ownership issue during the damages phase of trial when he testified on his own behalf. (See e.g., *People v. Avena* (1996) 13 Cal.4th 394, 420 [counsel's reference to "beating aspect" of case, even if inartfully made, was sufficient to raise argument that defendant's statement was not voluntary].) Pitto also conceded on cross examination that he bought merlot grapes from Bowen, the neighbor who actually owned the merlot acreage in dispute. Given the somewhat unique manner in which this case was tried, with the liability phase focused on whether the document qualified as a binding agreement for 2008 and 2009, or for 2007 only, and not specifically on what each party was required to do if a binding agreement was found to exist, we do not find it problematic that Lind raised the merlot ownership issue during the damages phase of the bifurcated trial. Control or ownership of the merlot acreage was inextricably linked to the ultimate

damages issue based on the language of the contract that Pitto supplied. It was therefore appropriate to raise it during the damages phase of trial.

Because the plain language of the contract obligated Lind to sell Pitto merlot grapes from the specified 25 acres only if he owned or leased the land in 2008 and 2009, and because he did not own or lease the land in those years, he could not be held liable for failing to sell Lind the merlot grapes in 2008 and 2009. The portion of damages awarded for those years and for that variety of grapes was unwarranted, and, hence, excessive. (*Jacobs v. Farmers' Mutual Fire Ins. Co. of Turlock* (1935) 5 Cal.App.2d 1, 5 [damages are excessive when they exceed the terms of a contract].) "When the trial court makes a clear, uncontroverted and prejudicial error of law in the calculation of damages, the appellate court has the power to modify the judgment to correct that error." (*Maughan v. Correia* (2012) 210 Cal.App.4th 507, 523; Code Civ. Proc., § 43 [the Courts of Appeal "may affirm, reverse, or modify any judgment or order appealed from"]; *Beagle v. Vasold* (1966) 65 Cal.2d 166, 178 [trial and appellate courts have power and duty to reduce unreasonably large damages awards]; *Walker v. Los Angeles County Metropolitan Transportation Authority* (2005) 35 Cal.4th 15, 19 ["order *denying* a motion for new trial is not independently appealable and may be reviewed only on appeal from the underlying judgment"].) We will therefore reduce the judgment by $70,417.23, which represents the damages and interest awarded for the merlot grapes in 2008 and 2009. (*Behr v. Redmond* (2011) 193 Cal.App.4th 517, 533 [when evidence is sufficient to sustain some but not all alleged damages, appellate court can reduce the judgment to the amount supported by the evidence].)

### DISPOSITION

The judgment is modified to strike any damages awarded for the merlot grapes in 2008 to 2009, and to reduce the total compensatory damages award to $63,563.80. In all

19

other respects, the judgment is affirmed.  Each party shall bear their own costs on appeal.  (Cal. Rules of Court, rule 8.278(a)(3).)


           HULL           , Acting P. J.


We concur:


       ROBIE        , J.


      MAURO       , J.